FOR PUBLICATION

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

RICHARD DEAN CLARK,
*Petitioner-Appellant*,

v.

KEVIN CHAPPELL, Warden,
*Respondent-Appellee.*

No. 14-99005

D.C. No.
3:97-cv-20618-WHA

OPINION

Appeal from the United States District Court
for the Northern District of California
William Alsup, District Judge, Presiding

Argued and Submitted April 16, 2019
Pasadena, California

Filed September 5, 2019

Before: Consuelo M. Callahan, Sandra S. Ikuta,
and John B. Owens, Circuit Judges.

Per Curiam Opinion

## SUMMARY[*]

### Habeas Corpus/Death Penalty

The panel affirmed in part and vacated in part the district court's denial of Richard Dean Clark's habeas corpus petition challenging his California conviction and capital sentence for the first-degree murder and rape of a 15-year-old, and remanded to the district court for reconsideration of one issue in light of *Godoy v. Spearman*, 861 F.3d 956 (9th Cir. 2017) (en banc).

Because the habeas petition was filed before April 24, 1996, the panel applied the standards in effect prior to the implementation of the Antiterrorism and Effective Death Penalty Act of 1996.

The panel held that Clark's five certified ineffective-assistance-of-counsel claims are unavailing because (1) Clark did not show that trial counsel's performance fell below an objective reasonableness standard at the time of trial or (2) in the few instances in which counsel's conduct was deficient, Clark has not shown that there is a reasonable probability that the outcome would have been different. In light of *Godoy*, the panel remanded for further proceedings on Clark's certified claim that his rights to due process and an impartial jury were violated when a juror communicated with his minister.

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

The panel rejected the state's argument that three of Clark's ten uncertified claims are procedurally barred from federal review, and granted a certificate of appealability on six of the uncertified claims. Affirming the district court's denial of habeas relief on two claims, the panel concluded that Clark did not establish any actual conflict of interest that adversely affected his representation. Affirming the district court's denial of Clark's claim that trial counsel was ineffective for failing to present life history evidence at the penalty phase, the panel concluded that trial counsel's presentation of life history evidence was not deficient. Affirming the district court's denial of Clark's claim that trial counsel was ineffective for failing to rebut a jailhouse report, the panel concluded that counsel's performance was not deficient. Affirming the district court's denial of Clark's claim that he was denied his Sixth Amendment right to be present for critical stages of the proceedings, the panel concluded that Clark did not explain how his presence at two meetings regarding possible conflicts of interest with counsel had a reasonably "substantial relationship" to his ability to defend himself. Affirming the district court's denial of Clark's claim that habeas relief is warranted under *Brady v. Maryland*, 373 U.S. 83 (1963), because the prosecution failed to disclose two pieces of exculpatory evidence, the panel concluded that there is not a reasonable probability that the result of the proceeding would have been different if the evidence had been disclosed to the defense. The panel affirmed the district court's denial of relief on Clark's claim that cumulative errors denied him a fair trial. The panel denied a COA on the remaining uncertified claims.

The panel affirmed the district court's denial of evidentiary hearings for all claims except the juror misconduct claim as to which the district court will

determine on remand whether an evidentiary hearing is warranted.

---

## COUNSEL

John R. Grele (argued), San Francisco, California, for Petitioner-Appellant.

Alice B. Lustre (argued), Deputy Attorney General; Glenn R. Pruden, Supervising Deputy Attorney General; Jeffrey M. Laurence, Senior Assistant Attorney General; Xavier Becerra, Attorney General; Office of the Attorney General, San Francisco, California; for Respondent-Appellee.

---

## OPINION

PER CURIAM:

California state prisoner Richard Dean Clark appeals from the district court's denial of his 28 U.S.C. § 2254 habeas corpus petition challenging his conviction and capital sentence for the first-degree murder and rape of fifteen-year-old Rosie Grover in 1985.

On appeal, Clark raises sixteen claims, of which six were certified: (1) ineffective assistance of counsel for failing to advise Clark to accept a plea offer; (2) violation of Clark's rights to due process and an impartial jury by juror misconduct; (3) ineffective assistance of counsel for calling Dr. Mayland to testify at the pre-trial suppression hearing; (4) ineffective assistance of counsel in preparing and presenting expert testimony; (5) ineffective assistance of counsel for failing to investigate and present evidence of

Clark's fetal alcohol exposure, traumatic birth, and the ensuing effects from both; and (6) ineffective assistance of counsel for failure to argue that Dean "Dino" Stevens was an alternative suspect or co-participant and prosecutorial misconduct in failing to disclose information about Dino. Clark also raises ten uncertified claims, six of which we grant a certificate of appealability ("COA") and deny on the merits and three of which fail to satisfy the COA standard.

Because Clark's federal habeas petition was filed before April 24, 1996, the habeas standards in effect prior to the implementation of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") apply. Under pre-AEDPA standards, both questions of law and mixed questions of law and fact are subject to de novo review, which means that a federal habeas court owes no deference to a state court's resolution of such legal questions (in contrast with post-AEDPA standards). *See Williams v. Taylor*, 529 U.S. 362, 400 (2000); *see also Robinson v. Schriro*, 595 F.3d 1086, 1099 (9th Cir. 2010). But the state court's factual findings are entitled to a presumption of correctness unless one of the exceptions under 28 U.S.C. § 2254(d) (1991) is met.

Clark's numerous ineffective assistance of counsel claims, governed by *Strickland v. Washington*, 466 U.S. 668 (1984), are unavailing because Clark does not show that trial counsel's performance fell below an objective reasonableness standard at the time of the trial in 1987. Furthermore, for the few instances where counsel's conduct was deficient, Clark has not shown that there is a reasonable probability that the outcome would have been different. His efforts to show prejudice are undercut by the extensive evidence presented at trial, including his two detailed confessions and the physical evidence confirming his involvement in the crimes. The post-conviction mitigating

evidence Clark marshals to support his argument that the penalty phase would have been different is cumulative of the mitigating evidence presented at the guilt and penalty phases of trial. We similarly find unpersuasive Clark's conflict of interest claim under *Mickens v. Taylor*, 535 U.S. 162, 171 (2002), based on his first attorney's election as District Attorney and his subsequent attorney's representation of witnesses.

On one issue, juror misconduct, we remand to the district court to decide Clark's claim in light of our recent decision in *Godoy v. Spearman*, 861 F.3d 956 (9th Cir. 2017) (en banc).

We otherwise deny habeas relief. We also affirm the district court's denial of evidentiary hearings for all claims (with the exception of the juror misconduct issue), concluding Clark has not shown that he would be entitled to relief on his proffered facts.

## I. FACTUAL BACKGROUND

### A. The Crimes

Around 4:00 a.m. on July 19, 1985, fifteen-year-old Rosie Grover arrived at the Greyhound bus depot in Ukiah, California. After unsuccessfully attempting to obtain a ride, she started walking to her mother's house. Several hours later, her body was found in a nearby creek-bed. Grover had been raped, stabbed with a sharpened screwdriver, and bludgeoned in the head and neck with two concrete blocks.

At the time of the crimes, Defendant-Appellant Richard Dean Clark, then twenty-one years old, was living with and caring for his paraplegic friend, David Smith, in Ukiah. On the day before the crimes, Clark and Smith spent the

afternoon drinking beer, ingesting cocaine, and smoking marijuana. Clark drank three or four beers at the local bar. Clark and Smith both ingested cocaine at the house of Smith's stepsister, Michelle Stevens. Although Smith had seen Clark use methamphetamine in the past, he did not see Clark use methamphetamine that day. Clark smoked between two and five marijuana cigarettes.

Later that evening, a fight broke out between Clark and Michelle's boyfriend, Matt Williams. According to Williams, Clark "looked like he was on something" and "got kind of violent, shadow boxing around the house and throwing punches." Around 10:00 p.m., Clark announced that he "was going to beat somebody up and rob them" and then he left with Dino Stevens—Michelle's stepbrother.

Clark and Dino played pool at Munchie's, a local pool hall, for approximately 30 to 40 minutes. After they left the pool hall, they went to the home of Robyn Boyd, who lived near the Ukiah bus depot. Clark and Dino left Boyd's house around 12:30 a.m. Upon leaving, the men went their separate ways.

Little evidence, other than Clark's statements to the police, establish Clark's location and movements from the time that he left Boyd's house until he entered a restaurant later that morning.

On July 19 at about 6:15 a.m., Clark walked into Ron-Dee-Voo Restaurant near the Greyhound bus depot with a partially empty wine cooler bottle in his hand. He told Karen Mertle, a waitress, that he found a girl's body in a nearby ditch who was hurt "real bad" and "maybe raped." He handed Mertle the wine cooler bottle, which she saved to give to the police. Mertle testified that Clark did not appear

intoxicated. Several witnesses from the restaurant testified that Clark did not appear intoxicated or upset.

Officer Wayne McBride of the Ukiah Police Department arrived at the restaurant at around 6:34 a.m. Clark told Officer McBride that he found the body when he was taking a "shortcut" to buy cigarettes at a convenience store and that he checked the body for a pulse and may have touched the suitcase found near the body. Officer McBride testified that Clark was wearing sunglasses and spoke rapidly but did not appear to be intoxicated and did not smell of alcohol.

Detectives Fred Kelley and Edward Gall collected physical evidence at the crime scene. Grover's body was partially clothed with her jeans buttoned, a cloth belt undone, her jacket and blouse open exposing her bra, and her shoes and tank-top lying on the ground nearby. Her duffle bag and suitcase were about ten feet away from her body, and inside her duffle bag was the same brand and flavor of wine coolers as the bottle Clark had given to Mertle. Two bloody concrete blocks—the heavier of the two weighing about 18.5 pounds—were found near Grover's body with traces of human blood and hair, consistent with Grover's.

After searching the crime scene, Detectives Kelley and Gall went to Michelle's house, where Clark and Smith were residing at the time, and received Smith's permission to search Smith's car. Detective Kelley found a pair of Levi's jeans and a vest-jacket on the rear seat with blood splattered on the jeans and smeared on the vest. Smith and Michelle identified the clothing as having been worn by Clark the previous evening. The blood was found to be consistent with both Grover's and Clark's blood.

One week later, a hand-sharpened screwdriver with traces of human blood was found in Smith's car. On the

shoes Clark wore when he was arrested, there was splattered human blood and a hair that was found to be consistent with Grover's hair and inconsistent with Clark's hair. Clark "could not be ruled out" as the source of the semen found in the victim's underwear, and the pubic hair found in the victim's underwear was consistent with Clark's.

## B. Clark's Confessions

Clark gave three custodial statements to the police on the day of his arrest. First, at the police station and prior to his arrest, Clark waived his *Miranda* rights and spoke to Detectives Kelley and Gall, essentially repeating the same story he told Officer McBride earlier in the morning at the restaurant.

Second, after Clark's arrest and booking, Detectives Kelley and Gall transported Clark to the hospital to obtain a sample of Clark's blood. During the drive, Clark confessed to killing Grover. During the drive, Clark suddenly asked, "What can someone get for something like this, thirty years?" Detective Gall testified at trial that he had responded: "Probably not unless you were a mass murderer." Fifteen to twenty-five seconds following this exchange Clark said, "I want this on the record. I'm guilty. I killed her. What do you want to know?" Clark told the officers that he was walking southbound on State Street when he met Grover. Clark told the officers that Grover "started to come on to him." The officer recalled that Clark said that Grover "flashed" her breast at him. Clark said that he and Grover had consensual sexual intercourse, but that afterward Grover threatened "that she was going to cry rape." Clark said that he thought that he would probably receive a less severe penalty for killing her than raping her and so then began to choke her. Clark said he found "what appeared to be a screwdriver, just the metal shaft part, . . . in the creekbed and

he said he stabbed [Grover] several times," and "took a large piece of cement and hit [Grover] in the head with it." Clark told the officers that he then went back to Michelle's house and changed his clothing. Clark left a pair of Levi's jeans and his jacket in the back of Smith's car. Clark told the officers that he then returned to the crime scene because he thought that if he reported finding the body, no one would suspect that he killed Grover. In this confession, Clark did not mention blacking out during the crimes.

Third, upon returning to the police station, Clark waived his constitutional rights and agreed to provide a tape-recorded statement to Detectives Kelley and Gall and Deputy District Attorney Al Kubanis. The recorded statement differed somewhat from the statement Clark gave in the patrol car. In the recorded statement, Clark explained that during the prior evening he had ingested eight or nine beers, several tablets of Valium, one-eighth gram of methamphetamine, and several marijuana cigarettes, and that he had "blacked out" during the course of the crimes. During this confession, Clark repeated that he was walking southbound on State Street when he met Grover. Clark said that "the next thing [he] kn[e]w [Grover had] her top off." Clark again admitted to having sexual intercourse with Grover and claimed it was consensual. Clark said that, following the encounter, Grover "said she was going to cry rape" and "to put [him] in jail for 20, 30 years." Clark stated that then he "grabbed her by the neck" and "started choking her." In the recorded statement, unlike in the patrol car confession, Clark claimed he blacked out, and the next thing he remembered was that he was "bashing [a] rock" into Grover. Clark told the police that he believed he hit Grover in the head with the rock. Clark said that he "remember[ed] throwing a piece of metal" that "looked like an old broken screwdriver or something" but that he did not remember

stabbing Grover. When questioned about his earlier statement in the patrol car in which he said he had stabbed Grover, Clark said that was simply his assumption based on the officers telling him that she had stab wounds. The taped statement lasted about 35 minutes.

## II.  JUDICIAL PROCEEDINGS

### A.  Pre-Trial Issues

Clark was arraigned on July 23, 1985, in Ukiah. Clark entered a not guilty plea. Although the crimes occurred in Mendocino County, the state court granted Clark's motion to change venue to Santa Clara County for the trial.

#### 1.  Representation

At the arraignment, the Mendocino County Public Defender Susan Massini was appointed to represent Clark. In September 1985, Joseph Allen, an experienced capital defense attorney, became co-counsel at Massini's request due to her inexperience with capital cases. Massini and Allen jointly represented Clark through June 1986.

In January 1986, Massini decided to run for Mendocino County District Attorney. On February 7, 1986, there was a pre-trial conference regarding the trial date. The deputy district attorney wanted the trial date set before June 1986 because he was worried that Massini might be elected District Attorney and present conflict of interest problems. Massini and Allen objected, doubting that such problems would arise. However, Massini was elected as the District Attorney in June 1986 and took office in January 1987. After the election, Allen moved to recuse the District Attorney's Office from prosecuting Clark's case. The court granted the motion, and the Attorney General was

substituted as prosecutor. When Massini relinquished the position of Mendocino County Public Defender, Ronald Brown was promoted to that position and became co-counsel with Allen. Brown or his office had previously represented prosecution witnesses Robyn Boyd, David Smith, Dino Stevens, and Matt Williams in unrelated matters.

### 2. Psychiatric Evaluation

In late July 1985, Massini retained Dr. Peter Mayland, a practicing psychiatrist with a specialty in forensic psychiatry, as a mental health consultant to evaluate both Clark's competency to stand trial and the possibility of a mental-health-related defense or mitigation at trial. Dr. Mayland first met with Clark at the Mendocino County Jail several days after Clark was arrested. Dr. Mayland recommended that Massini consult with his former colleague Dr. Rex Beaber to assess whether Clark had an impairment that might provide the basis of a viable mental defense.

Clark met with Dr. Beaber on November 23 and 24, 1985. Dr. Beaber concluded that he probably could not be of assistance to the defense from a guilt standpoint. Massini requested that Dr. Beaber write a letter to summarize his findings. According to Dr. Mayland's declaration, Dr. Beaber thought it might be best if he did not write a report of any sort, but Massini insisted that he generate a report that detailed his findings. In response to Massini's request, Dr. Beaber drafted a one-page letter detailing his findings. The letter indicates that "Clark does not appear to suffer from any organic brain dysfunction, psychosis, schizophrenia, or affective disorder." According to Dr. Beaber, Clark did not evince any disorder that would impair his capacity to form the requisite intent for the crimes charged. Instead, Dr. Beaber's letter indicates that Clark's

"'amnesia' appears to be typical psychogenic post-homicide amnesia [that] is not, in itself, demonstrative of any particular disability regarding the usual mens rea issues." Dr. Beaber's letter concludes that Clark suffers from "a sociopathic personality disorder" and exhibits characteristics of a "sexual psychopath," which resulted from "severe maternal deprivations throughout his childhood." Allen, who became co-counsel after Massini received Dr. Beaber's letter, was unaware of the nature of Dr. Beaber's letter.

### 3. Plea Offer

At some point before the pre-trial suppression hearing, the state offered Clark a deal to plead guilty to first-degree murder with a sentence of life without parole. Dr. Mayland and Brown thought taking the plea deal was the best option, but Allen disagreed. Allen thought there was a good chance he could get a life sentence or even a second-degree verdict. Allen also thought that he could potentially get Clark's statements to the police suppressed at the suppression hearing, but the state declined to leave the deal open through the litigation of the suppression issues. Allen informed Clark "that the only choice he had was life without parole or a trial." Clark ultimately "decided to go to trial."

### 4. The Pre-Trial Suppression Hearing

On October 20, 1986, the court conducted a lengthy hearing on Clark's motion to suppress his confessions. The hearing included both documentary and testimonial evidence.

Dr. Mayland testified for the defense. By that time, Dr. Mayland had met with Clark regularly and developed a therapeutic relationship with him. Although Dr. Mayland regularly discussed the case with Allen, Allen did not know

that Dr. Mayland had talked to Clark about the facts of the crimes beyond Dr. Mayland's initial interview with Clark.

Dr. Mayland testified that, based upon psychological factors arising from Clark's childhood, lifestyle, and drug use, he possessed "serious doubt" regarding whether Clark could have understood and intelligently waived his *Miranda* rights on July 19, 1985. During cross-examination, the prosecution asked Dr. Mayland what Clark told him about the crimes. Dr. Mayland testified that Clark told him details about the crimes on two separate occasions—first, in the initial interview at the Mendocino County Jail several days after Clark's arrest, and second, in a meeting about a month after that initial interview. Dr. Mayland reviewed his notes and read them at the suppression hearing.

In Clark's first account to Dr. Mayland, Clark told Dr. Mayland that he met Grover, that Grover performed oral sex on Clark, and that Grover and Clark had consensual sexual intercourse. According to Dr. Mayland's notes, Clark told Dr. Mayland that Grover said, "If I don't get pregnant, I won't cry rape." Clark then stated, "If you cry rape, this is what's going to happen to you," and he then "put [his] hands on her neck." Then, Clark stated he "blacked out." Clark woke up to Grover "all bloody" and got "scared." He then "ran back to the car, [and] changed his pants and jacket" at Michelle's house.

In Clark's second account to Dr. Mayland, Clark stated that he grabbed Grover and pulled her behind a building and demanded of Grover, "Why don't you show me some tit, bitch" and "suck my dick" (referred to herein as the "lewd statements"). Grover asked him what he wanted, and Clark pointed to his genital area. Grover said that she would give Clark one hundred dollars to come to her home. Clark said no because Grover would just turn him in. Clark told Grover

to take off her clothes. Clark said that Grover was scared and that Clark acted "mean." Grover said to Clark, "Please don't hurt me. I'll do anything you want." Clark then had sexual intercourse with Grover. Afterwards, Clark asked if Grover was "going to cry rape." Clark said, "If you say anything, . . . this is what's going to happen to you if you cry rape." Then, Clark began to choke Grover. According to Dr. Mayland's notes, Clark stated: "I was scared she was going to suffer, so I— . . . I didn't mean to. I lost control. She was still jittering. I stabbed her. I was trying to get it over. I figured I already killed her and didn't want her to suffer. She totally stopped moving. I ran. Went back to the car and changed clothes."

The state court ruled that the prosecutor could use at trial Clark's statements to Dr. Mayland to impeach Clark's experts, that "tendering of the psychiatric defense" waived any Fifth and Sixth Amendment privileges, and that Clark waived the statutory attorney-client and psychotherapist-patient privileges.

Allen and Brown both thought that the trial judge had assured them that Dr. Mayland's testimony at the pre-trial suppression hearing would not be admissible at trial for any purpose. According to counsel, this agreement occurred in an unreported in-chambers conference during the suppression hearing. Clark was not present during this conference. Defense Investigator Howard McPherson also understood that the trial judge had assured Allen that Dr. Mayland's testimony would not be admissible at trial for any purpose. The trial judge later stated that he did not recall any such discussion in chambers.

## B.  The Trial

Voir dire on the case started on October 20, 1986, and the presentation of evidence began on March 9, 1987.

### 1.   The Guilt Phase

#### a.   *The Prosecution's Case at the Guilt Phase*

At trial, the prosecution called experts to testify to the gruesome nature of the crimes.  The prosecution also introduced evidence regarding Clark's confessions by calling the detectives to testify regarding Clark's confession in the patrol car and playing the recording of Clark's taped confession at the police station.

The autopsy confirmed that Grover was raped, stabbed, and beaten.  The autopsy was performed under the direction of Dr. Boyd Stephens, who testified at trial.  Dr. Stephens opined that the lacerations to Grover's vaginal area were consistent with nonconsensual sexual intercourse, and sperm was found inside and outside her vagina.  Dr. Stephens could not make a conclusive finding on whether sodomy had occurred.  No trauma to the anal opening was observed, but a "rare" sperm was found in the anus.

Dr. Stephens testified that, although two of the ten stab wounds penetrated Grover's heart and lungs and could have independently killed her, the actual cause of death was blunt trauma to the head and neck.  Dr. Stephens could not determine how many blows had been struck, but nineteen separate areas of blunt trauma were visible.  Grover's face was bludgeoned so extensively that her facial structure was collapsed and her brain tissue exuded through her skull fractures.  There was no conclusive evidence of attempted strangulation, in large part because the blunt trauma injuries

were so extensive that they obscured any signs of strangulation that would have normally been present.

A criminalist testified about tests performed on the physical evidence. Analysis of the blood splatters on Clark's jeans revealed enzymes consistent with both Clark's and Grover's blood. A hair found on one of Clark's shoes was consistent with Grover's hair. Clark could not be ruled out as the source of semen. The concrete blocks had traces of blood and hair consistent with Grover's. The sharpened screwdriver found in Smith's car approximately a week after the murder bore traces of human blood.

The prosecution's strategy to fight Clark's theory of "rage reaction" was, during cross-examination of the defense witnesses, to rely on Dr. Mayland's second account of meeting with Clark, including the two lewd statements. The prosecution used the testimony to compel the defense experts to admit that Clark's actions were goal-oriented, and thus is inconsistent with a rage reaction.

### b. The Defense's Case at the Guilt Phase

Clark did not dispute at trial that he killed Grover, but instead, the defense strategy at trial was to argue Clark lacked the intent to kill her. The defense asserted that Clark had emotional difficulties and chronic drug use that resulted in a "rage reaction" during the crimes. Defense counsel argued that "a person who goes into a rage [reaction] is not acting with intent."

The defense's case centered around disputing that Clark was able to form the requisite state of mind to kill based on his emotional difficulties, severe depression, and chronic drug use that culminated in a "rage reaction" on the night of the murder. The defense called several witnesses to testify

that Clark used drugs from an early age and regularly ingested alcohol, marijuana, and methamphetamine. Witnesses also testified that Clark was severely depressed, attempted suicide in February 1985, and increased his drug usage following the suicide attempt.

Clark also called numerous expert witnesses during the guilt phase to support the rage reaction theory. These included Dr. Randall Baselt, a forensic toxicologist, who testified regarding his analysis of the blood sample taken from Clark shortly after arrest. Dr. Baselt testified to traces of marijuana and Valium in Clark's blood.

Dr. Ronald Roberts, a clinical psychologist for the defense, conducted testing on Clark to determine his then-current psychological functioning and whether he suffered from any neuropsychological deficits. Dr. Roberts testified about his test results. The prosecution cross-examined Dr. Roberts by using the two lewd statements in Clark's second account to Dr. Mayland. Dr. Roberts testified that Clark had not mentioned making those statements to Grover, but had told Dr. Roberts that Grover tried to talk Clark out of forcing her to have sex.

Dr. David Smith, the medical director of the Haight Ashbury Free Medical Clinic, testified extensively about the effects of methamphetamine abuse and the phenomenon of a "rage reaction." He also testified that the extent of debilitative drug effect cannot be determined by the level of methamphetamine in the blood, because the effect of dosages taken over time is cumulative. On direct examination, Dr. Smith testified that "[a] rational, goal-oriented reaction to the sensory stimulus" was less likely to reflect impairment or a so-called rage reaction.

On cross-examination, the prosecution attempted to show that Clark was engaging in goal-oriented behavior and thus not having a rage reaction. The prosecution relied on testimony in the record and Dr. Mayland's second account to create a hypothetical "goal." The prosecution asked Smith to consider this hypothetical: "Assume that at about 11:00 p.m. at night a man says to certain acquaintances of his I'm going to go out and steal something and I'm going to screw somebody up or beat somebody up." Dr. Smith agreed that this was a "rational goal-oriented statement." The prosecution then asked if a series of hypothetical actions, such as stealing a battery, obtaining a sharpened screwdriver, and grabbing a woman and pulling her behind a building, were consistent with this hypothetical 11:00 p.m. goal-oriented statement. Dr. Smith agreed they were.

The prosecution then asked about the two lewd statements that Dr. Mayland testified about: Clark's statements to Dr. Mayland that he demanded of Grover "Why don't you show me some tit, bitch" and "suck my dick." The prosecution asked if these statements were consistent with the goal reflected in the hypothetical. Based on the defense's objection and after the judge's sidebar with counsel outside the presence of the jury, the judge ultimately concluded that both lewd statements could be used as hypotheticals in the cross-examination of Dr. Smith. The judge admonished the jury that it could not consider the statements for their truth, but "only as it may assist you in understanding the opinion of this expert now on the stand." Dr. Smith agreed that both lewd statements were consistent with the goal reflected in the hypothetical. The prosecution also asked if, assuming hypothetically, some of the other details of Clark's statements, including removing Grover's clothing, reacting to her threat of reporting him for rape, and

killing Grover, were consistent with goal-oriented behavior. Dr. Smith agreed that they were.

Dr. Stephen Raffle, a psychiatrist for the defense, testified regarding Clark's mental condition at the time of the murder. Dr. Raffle testified that Clark had suffered a rage reaction, and Dr. Raffle diagnosed Clark with a borderline personality disorder. The prosecution asked Dr. Raffle whether Clark admitted to Dr. Raffle that the sexual intercourse was forced, and Dr. Raffle said yes. During the cross-examination of Dr. Raffle, Dr. Raffle agreed that Clark had been lying at some points in his rendition of the story. Dr. Raffle also agreed during cross-examination that Clark could be psychopathic and brilliant, rather than having a rage reaction, based on his lying.

Later in Dr. Raffle's testimony, the prosecution asked Dr. Raffle to assume the truth of all of the details of Dr. Mayland's testimony regarding Clark's second account. After the prosecution went through Dr. Mayland's testimony, the prosecution asked Dr. Raffle whether he believed Clark's statements about his remorse were genuine. Dr. Raffle testified that he believed they reflected true remorse at the time.

The prosecution also asked Dr. Raffle about Dr. Beaber's letter. Dr. Raffle responded: "It does not give me any of his clinical data, nor do I have available to me any of his clinical data for analysis."

### c. *The Verdict*

On June 22, 1987, the jury convicted Clark of first-degree murder and rape under California Penal Code § 187 and § 261(2). The jury also found true the special circumstance allegations: (a) that Clark committed the

murder during the course of the rape under § 190.2(a)(17)(iii); (b) that he inflicted bodily injury with the intent to do so under § 1203.075(a)(1); and (c) that he used a deadly weapon (a screwdriver) in the commission of the murder under § 12022(b).

### 2. The Penalty Phase

#### a. *The Prosecution's Case at the Penalty Phase*

Relying on the circumstances of the murder, the prosecution presented no aggravating evidence during the penalty phase.

#### b. *The Defense's Case at the Penalty Phase*

The defense presented the testimony of 23 witnesses in mitigation, including Clark's family members, friends, scoutmasters, a teacher, and a mental health counselor. The mitigating evidence focused on Clark's deteriorated family situation, Clark's father's death, and Clark's drug use and mental health problems. The California Supreme Court's decision on direct appeal provides a recitation of Clark's life history presented by the defense at the penalty phase:

> Defendant was the eldest child of Diane and Paul Dean Clark and the brother of Robert and Annette. Although some testimony indicated that defendant's father drank and was abusive, defendant's family life was relatively stable until his parents' separation and his father's subsequent death. While his parents were together, defendant was active in the Boy Scouts and his parents served as scoutmasters. Several witnesses remembered defendant as an "excellent" or

"good" scout, who interacted well with his peers.

Numerous witnesses recounted how defendant's family situation deteriorated dramatically after his parents' separation, which occurred when defendant was about 10 years old. Defendant's mother worked menial jobs, often at night. The children were generally left unsupervised. Defendant's mother developed a drinking problem. After her shift, she would not go home to the children, but instead would stop to have a few drinks at the local tavern. Defendant's mother failed to provide a sanitary home or nutritious food for the children. Extensive testimony described the filthy conditions of the home. Defendant tried to care for his younger sister in his mother's absence and to subdue the aggressive behavior of his brother.

After his father's death, which was followed closely by the deaths of both his paternal and maternal grandfathers, witnesses noticed a change in defendant's behavior. Defendant became chronically depressed and stayed withdrawn in his room for extended periods of time.

About this time, defendant and his brother began to drink and use drugs. Their house became the neighborhood "party house" and was akin to a "riot area." There was conflicting testimony regarding whether defendant would ingest intoxicants when he

was caring for his sister. Several of the friends who frequented the defendant's house testified that he was not "the violent type" and frequently broke up physical fights.

During this period of time, defendant and his siblings would occasionally visit a ranch owned by his maternal grandmother. His grandmother and other relatives remembered defendant as a hard worker who volunteered to do tasks at the ranch.

Defendant and his family received counseling from the fall of 1980 through March of 1983. The counseling was precipitated by a fight between defendant and his brother. The counselor found defendant to be depressed and frustrated in school due to a reading problem. Defendant was cooperative during counseling and seemed to care for his family.

Eventually defendant was removed from his mother's custody and placed in a foster home. He apparently thrived in the structured environment. Defendant had a "beautiful" relationship with the other children in the home. However, he occasionally drank beer and smoked marijuana with his foster mother's son. While living at the foster home, defendant was enrolled in a special education program, which began to address his significant reading deficiency as well as his emotional problems. Defendant was a responsible student and did well in his classes. He was

popular and would defend other children. He continued to have a problem with drug usage during the school day, which his teacher attributed to a need to escape the pain and anger he felt about his mother and brother.

When defendant graduated from high school, he was forced to leave his foster home. He worked at the Aloha Saw and Mower Shop. The owner remembered him as a reliable worker with a good attitude. He lived for a time with Keith Michalek. Both Keith and his father recalled defendant as a good, trustworthy person, who was never "rowdy." While he was living with Keith, he drank beer and smoked marijuana occasionally, but did not use "hard" drugs.

Defendant's mother convinced defendant to quit his job and come live with her in Anderson. His mother later moved to Oregon without him. Prior to his mother's move, defendant tried to commit suicide, apparently as the result of a failed romantic relationship.

While he was living in Anderson, defendant began to care for Smith. Robert Clark testified that Smith was a heroin addict. About three months before the murder, defendant injected methamphetamine for the first time.

Numerous witnesses testified that they could not believe that defendant had committed the crimes for which he was convicted.

Finally, the jury heard that while he was awaiting his trial, defendant continued his attempt to overcome his reading deficiency by working with a counselor from the Mendocino County Adult Literacy Program.

*People v. Clark*, 857 P.2d 1099, 1145–46 (Cal. 1993).

### c.  The Penalty

On August 14, 1987, the jury imposed the death penalty upon Clark.  On direct appeal, the California Supreme Court issued a reasoned decision on August 30, 1993, affirming Clark's conviction and sentence.  *Clark*, 857 P.2d at 1110. In its decision, the court rejected Clark's claims of conflict of interest (uncertified Claims 5 and 6). *Id.* at 1130–32. On June 30, 1994, the United States Supreme Court denied his petition for writ of certiorari.  *Clark v. California*, 512 U.S. 1253 (1994).

## C.  Post-Conviction

### 1.  Post-Conviction Issues

### a.  Manda Report

On July 19, 1985 (the day of the murder), Deputy Glenn Manda of the Mendocino County Sheriff's office prepared a coroner's report (the "Manda Report").  Post-conviction, Clark contends that this is exculpatory evidence that was withheld by the prosecution during trial.

According to the report, which states it was filled out at 11:00 a.m., Deputy Manda conducted an autopsy at the mortuary, which revealed puncture wounds on Grover's upper back near the spine.  The report also states that Deputy

Manda notified the Ukiah Police Department, and Detective Gall arrived at the mortuary to take photos of the body.

### b. *Jailhouse Report*

On October 17, 1985, one of the guards at Mendocino County Jail wrote an "Inmate Safety Report," expressing concern for Clark's safety. The report states that "[i]nmates in [the] exercise yard hinted that Richard Clark may be assaulted tonight." The report further relayed that inmates Barella, Hull, Brackett, and Strobridge "stated that Clark might not make it through the night" and "he should be moved or else he would be assaulted due to Clark's cocky attitude and lack of remorse." The report commented that "[t]he inmates would not be specific, but felt we should be warned." The reporting guard advised his supervisor of the situation, and "Clark [was] moved to Isolation for his own protection."

The jailhouse report was admitted into evidence during trial. The state asked Dr. Raffle questions about the report during cross-examination in an effort to impeach Dr. Raffle's opinion that Clark was remorseful about his crimes. The only objection to this line of questioning was that the defendant had not received a copy of the report.

During post-conviction proceedings, the defense obtained declarations of two of the inmates named in the report. In his 1998 declaration, Inmate Robert Brackett stated: he was then in custody with Clark; he was at that time represented by Public Defender Brown; Clark "never said or did anything that indicated lack of remorse"; and Clark "did not act cocky or proud in any way." In his 1998 declaration, Inmate John Strobridge stated: Clark never said or did anything or acted in any way that showed a lack of remorse; Strobridge never thought that Clark was cocky; Clark never

bragged about the crimes; and Clark once said: "I was so out of my mind on drugs. I wish it never happened."

### c. *Juror Communication with a Minister*

In 1996, about nine years after Clark's conviction, one of the jurors, Frederick Barnes, declared that during the trial he had consulted with a minister about the death penalty. Specifically, Juror Barnes declared:

> During the guilt phase of the trial, it became clear that the special circumstances would be found to be true and that there would be a penalty phase. I consulted with a minister about the propriety of imposing the death penalty. I explained to him my role in the trial and the facts of the case. He told me that in these circumstances the death sentence would be appropriate because the Bible says, "an eye for an eye." The minister's advice was useful. I had long believed that anyone who is guilty of murder and convicted with a special circumstance should be given the death penalty.

At oral argument in this appeal on April 16, 2019, the state's attorney presented for the first time on appeal a declaration by Investigator Randall Wong, dated September 3, 1997. The state's attorney conceded at oral argument that the declaration was not in the excerpts of record. Subsequently, the state added the declaration as a

supplement to the excerpts of record.[1]  Investigator Wong stated in his declaration:

> On August 4, 1997, Mr. Kaster and I interviewed Mr. Barnes at his residence in San Jose, California.  Mr. Barnes was asked about that part of his declaration which states that he consulted with a minister during the guilt phase.  The declaration states that Mr. Barnes explained to the minister his "role in the trial and the facts of the case."

> Mr. Barnes told Mr. Kaster and myself that he had asked the minister how the minister felt about the death penalty issue. The minister replied that the Bible says "an eye for an eye" and said he did not question the death penalty.  Mr. Barnes also said that the minister's statement did not settle the issue; the evidence in the case was the main thing that made Mr. Barnes decide on the death penalty.

---

[1] In 1997, the state hired Investigator Randall Wong to interview Juror Barnes to obtain more information regarding the alleged conversation between Barnes and his minister.  Investigator Wong prepared a declaration describing the results of the interview.  According to the district court, the state put this declaration into evidence during Clark's state habeas proceeding.  Three years later, the state sought to introduce the declaration in the federal proceedings (over Clark's objections) in support of its motion for summary judgment. The district court did not rule on Clark's objections, but instead expressly declined to consider Wong's declaration when it ruled on the summary judgment motion.  The district court did not mention the Wong declaration in its April 2014 order.

Mr. Barnes told us that he had not discussed the evidence from the trial with his minister. When the declaration was presented to him by Clark's agents he had missed that part which refers to "the facts of the case." Also, Mr. Barnes said that the talk with the minister came not during the guilt phase but around the time the penalty phase was starting or about to start.

2. Post-Conviction Proceedings

   a. *State Habeas Corpus Petitions*

Meanwhile, on February 18, 1993, Clark filed a state petition for writ of habeas corpus, which the California Supreme Court summarily denied on the merits on November 17, 1993. On May 1, 1997, Clark filed a second state habeas petition, which the California Supreme Court denied on August 13, 1998, finding several claims procedurally barred under California rules and also rejecting all the claims on the merits. In his first state petition, Clark raised the issues that have been designated in this federal proceeding as certified Issues 4, 5, and 6 and uncertified Claims 8, 11, and 36, and in his second state petition, Clark raised certified Issues 1, 2, and 3 and uncertified Claims 14F, 14L, 15B, 18, and 20.

   b. *Federal Habeas Corpus Petitions*

On April 19, 1995, Clark filed a federal petition for writ of habeas corpus in the Northern District of California under 28 U.S.C. § 2254. After he filed an amended federal petition in July 1996, unexhausted claims were identified and Clark was granted leave to return to state court to file an amended

state petition, and the federal proceedings were stayed pending exhaustion of state court remedies.

When Clark returned to federal court, he filed another amended federal habeas petition in 1998. The state filed a combined answer to the amended petition and motion for summary judgment on all claims. Clark opposed the motion for summary judgment and filed a cross-motion for summary judgment. A hearing was conducted on the issues. On May 8, 2000, the district court (Judge Ware) granted summary judgment in favor of the state on the vast majority of the claims. Judge Ware also found an evidentiary hearing to be necessary on Claim 19 (a shackling question, which is not raised on appeal). On June 5, 2000, the district court filed an order permitting Clark to file a request for an evidentiary hearing for claims that included the claims for which the district court had already granted summary judgment.

Immediately after the court's order, Clark filed a 400-page motion for evidentiary hearing. After further extensions of time and briefings and after Clark filed another amended federal habeas petition in July 2005, the district court denied Clark's motion for an evidentiary hearing without prejudice. From May 2006 through 2009, the proceedings were delayed further and the parties filed several status reports updating the court.[2]

On September 22, 2009, Clark filed his operative fifth amended federal habeas petition, alleging thirty-four claims for relief, including the six certified and ten uncertified

_____

[2] From May 2006 until May 2007, the proceedings were stayed to allow Clark time to investigate the accuracy of declarations before the court, which may have been falsified by investigator Kathleen Culhane, who had been charged with falsifying declarations and witness statements. Several declarations were later withdrawn.

claims on appeal here.  The state answered in May 2010, and the deadline for completing discovery was extended several times by request of both parties.

On August 1, 2012, Clark filed a renewed motion for an evidentiary hearing.  On September 5, 2012, the case was reassigned from Judge Ware to Judge Alsup.  On April 1, 2014, the district court denied Clark's motion for renewed evidentiary hearing, his writ of habeas corpus as to all of his claims for relief, and his request for a COA.  Final judgment issued, and this appeal followed.

### c.  The Current Appeal

On September 4, 2015, we granted in part Clark's motion for COA on six claims.  Clark raised the ten uncertified claims in his opening brief.  The parties filed supplemental briefs first in response to our order to address uncertified Claims 5, 6, 11, 14L, 18, and 20 with particularized focuses directed by the court.  Subsequently, the parties filed supplemental briefs in response to our order to address the impact, if any, of *Godoy v. Spearman*, 861 F.3d 956 (9th Cir. 2017) (en banc), and of *Williams v. Filson*, 908 F.3d 546 (9th Cir. 2018).  We have jurisdiction under 28 U.S.C. § 1294 and § 2253.

## III.    STANDARD OF REVIEW

AEDPA, which implemented changes to statutes governing federal habeas corpus petitions for state and federal prisoners, applies only to those cases that were filed after its effective date of April 24, 1996.  *Slack v. McDaniel*, 529 U.S. 473, 481–82 (2000); *Lindh v. Murphy*, 521 U.S. 320, 326–27 (1997).  Where a petitioner files an amended petition, the filing date of the original petition is the controlling date for purposes of determining whether

AEDPA applies. *Thomas v. Chappell*, 678 F.3d 1086, 1100–01 (9th Cir. 2012); *Smith v. Mahoney*, 611 F.3d 978, 994–95 (9th Cir. 2010). Here, Clark filed his original petition in 1995, before AEDPA's effective date. Pre-AEDPA standards thus govern his habeas petition.

Under pre-AEDPA standards, both questions of law and mixed questions of law and fact are subject to de novo review, which means that a federal habeas court owes no deference to a state court's resolution of such questions. *Williams*, 529 U.S. at 400; *Garcia v. Bunnell*, 33 F.3d 1193, 1195 (9th Cir. 1994) (reviewing conflict of interest claim in habeas petition as a mixed question of fact and law subject to de novo review). For factual findings under pre-AEDPA standards, the state court is entitled to a presumption of correctness unless one of the exceptions to 28 U.S.C. § 2254(d) (1991) is met, including, as relevant here:

> (1) that the merits of the factual dispute were not resolved in the State court hearing; (2) that the factfinding procedure employed by the State court was not adequate to afford a full and fair hearing; (3) that the material facts were not adequately developed at the State court hearing; . . . (6) that the applicant did not receive a full, fair, and adequate hearing in the State court proceeding; or (7) that the applicant was otherwise denied due process of law in the State court proceeding; (8) or unless that part of the record of the State court proceeding . . . is produced . . . and the Federal court on a consideration of such part of the record as a whole concludes that such factual

> determination is not fairly supported by the record . . . .

*Sumner v. Mata*, 455 U.S. 591, 592 & n.1 (1982) (per curiam) (quoting 28 U.S.C. § 2254(d) (1991)). The petitioner carries the burden to establish by convincing evidence that the state court's factual determination was erroneous. *Id.*

Dismissals based on state procedural default are reviewed de novo. *See Robinson*, 595 F.3d at 1099; *Griffin v. Johnson*, 350 F.3d 956, 960 (9th Cir. 2003). When "a state prisoner has defaulted his federal claims in state court pursuant to an independent and adequate state procedural rule, federal habeas review of the claims is barred unless the prisoner can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice." *Coleman v. Thompson*, 501 U.S. 722, 750 (1991).

Under pre-AEDPA standards, we review a district court's denial of an evidentiary hearing for abuse of discretion. *Baja v. Ducharme*, 187 F.3d 1075, 1077 (9th Cir. 1999).

## IV.  DISCUSSION

On appeal, Clark raises sixteen claims, of which six were certified: (1) ineffective assistance of counsel for failing to advise Clark to accept a plea offer; (2) violation of Clark's rights to due process and an impartial jury by juror misconduct; (3) ineffective assistance of counsel for calling Dr. Mayland to testify at the pre-trial suppression hearing; (4) ineffective assistance of counsel in preparing and presenting expert testimony; (5) ineffective assistance of

counsel for failing to investigate and present evidence of Clark's fetal alcohol exposure, traumatic birth, and the ensuing effects on both; and (6) ineffective assistance of counsel for failure to argue that Dino Stevens was an alternative suspect or co-participant and prosecutorial misconduct in failing to disclose information about Dino. Clark also raises ten uncertified claims.

## A. Evidentiary Hearing

Clark argues that the district court erred in denying his motion for an evidentiary hearing for all claims. The district court found that Clark had not "presented . . . colorable claim[s] of" relief and that all subsequently certified claims, as well as all of the uncertified claims could be "resolved on the record." Furthermore, the district court reasoned that denial of an evidentiary hearing was warranted for Claim 36 (cumulative error) because "none of the errors alleged in the fifth amended petition[] warrant relief."

Under pre-AEDPA standards, a petitioner is entitled to an evidentiary hearing if he can show: (1) the allegations, if proven, would entitle him to relief, and (2) the state court trier of fact had not reliably found the relevant facts after a full and fair hearing. *See Townsend v. Sain*, 372 U.S. 293, 312–13 (1963), *overruled in part by Keeney v. Tamayo-Reyes*, 504 U.S. 1 (1992); *see also Earp v. Ornoski*, 431 F.3d 1158, 1167 (9th Cir. 2005). We have found that the first prong requires that a petitioner "establish[] a colorable claim for relief," based on allegations of "specific facts which, if true, would entitle him to relief." *Earp*, 431 F.3d at 1167 & n.4 (footnote omitted) (quoting *Ortiz v. Stewart*, 149 F.3d 923, 934 (9th Cir. 1998), *overruling on other grounds recognized by Apelt v. Ryan*, 878 F.3d 800, 827–28 (9th Cir. 2017)). And, for the second prong, we have held that the

petitioner must show that he "has never been afforded a state or federal hearing on this claim." *Id.* at 1167.

However, "[a]n evidentiary hearing is not required on allegations that are 'conclusory and wholly devoid of specifics'" or "on issues that can be resolved by reference to the state court record." *Campbell v. Wood*, 18 F.3d 662, 679 (9th Cir. 1994) (en banc) (quoting *Boehme v. Maxwell*, 423 F.2d 1056, 1058 (9th Cir. 1970)). Nor is an evidentiary hearing required if "there are no disputed facts and the claim presents a purely legal question." *Hendricks v. Vasquez*, 974 F.2d 1099, 1103 (9th Cir. 1992).

As subsequently explained, reference to the state court record resolves Issues 1, 3, 4, 5, and 6 and Claims 5, 6, 11, 14L, and 20. *See Campbell*, 18 F.3d at 679. Clark's Claims 8, 14F, and 18 raise allegations that are conclusory and wholly devoid of specifics. *See id.* Claim 15B, fails on the second prong of *Townsend* because Clark has already been "afforded a state . . . hearing on this claim." *Earp*, 431 F.3d at 1167. Furthermore, even viewed cumulatively (Claim 36), Clark has not shown that relief is warranted, and thus an evidentiary hearing is not needed to resolve this claim. *See id.* We therefore affirm the district court's denial of an evidentiary hearing for all of these listed claims because Clark has not presented a colorable claim of relief. We reserve for the district court to determine on remand whether Issue 2 warrants an evidentiary hearing in light of *Godoy v. Spearman*, 861 F.3d 956 (9th Cir. 2017) (en banc).

## B. Certified Claims

1. **Issue 1**: We deny Clark's claim that trial counsel was ineffective by advising him to reject the plea offer.

Clark argues that trial counsel provided ineffective assistance of counsel because he recommended Clark reject the state's plea offer for life without parole. Specifically, Clark argues that Allen's recommendation constituted ineffective assistance because Allen gave unsound advice that Clark was likely to get second-degree murder.

Claims of ineffective assistance of counsel are governed by *Strickland*, 466 U.S. 668. To prevail, the defendant's burden is two-pronged. "First, the defendant must show that counsel's performance was deficient." *Id.* at 687. "Second, the defendant must show that the deficient performance prejudiced the defense." *Id.* Even in a pre-AEDPA case, "[j]udicial scrutiny of counsel's performance must be highly deferential." *Id.* at 689.

To show deficient performance, the defendant must show that "counsel's representation fell below an objective standard of reasonableness." *Id.* at 688. This requires "showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Id.* at 687. "A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Id.* at 689. Thus, "a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.* "[T]he defendant must overcome the

presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" *Id.* (quoting *Michel v. Louisiana*, 350 U.S. 91, 101 (1955)).

The Supreme Court has extended the Sixth Amendment right to effective assistance of counsel to plea negotiations. *Missouri v. Frye*, 566 U.S. 134, 140 (2012); *Lafler v. Cooper*, 566 U.S. 156, 162 (2012). In *Padilla v. Kentucky*, where counsel failed to inform his client of the consequence of deportation from accepting a plea, the Supreme Court held that "a petitioner must convince the court that a decision to reject the plea bargain would have been rational under the circumstances." 559 U.S. 356, 372 (2010). The defendant, though, has "the ultimate authority" to determine "whether to plead guilty." *Jones v. Barnes*, 463 U.S. 745, 751 (1983). Counsel's role, then, is to "both consult with the defendant and obtain consent to the recommended course of action." *Florida v. Nixon*, 543 U.S. 175, 187 (2004). In other words, the "role of counsel" under the Sixth Amendment is to "advis[e] a client about a plea offer and an ensuing guilty plea" and to provide "legal aid and advice [to] help" a criminal defendant exercise his ultimate authority in making a decision. *Frye*, 566 U.S. at 140, 144 (quoting *Massiah v. United States*, 377 U.S. 201, 204 (1964)).

We need not reach Clark's argument that Allen's performance was constitutionally deficient. Even if Allen's performance could have been construed as constitutionally deficient, Clark had the benefit of multiple attorneys. We read the Sixth Amendment "not [to] include the right to receive good advice from every lawyer a criminal defendant consults about his case." *United States v. Martini*, 31 F.3d 781, 782 (9th Cir. 1994) (per curiam). We share the Sixth Circuit's perspective that as the Sixth Amendment's "recitations have been framed and phrased, they encompass

an affirmative right (the right to effective assistance of counsel at critical proceedings), not a negative right (the right to be completely free from ineffective assistance)." *Logan v. United States*, 910 F.3d 864, 870 (6th Cir. 2018), *cert. denied*, 139 S. Ct. 1589 (2019). When a "petitioner receive[s] both competent and deficient advice on whether to accept [a] plea offer . . . [s]uch conflicting advice undercuts [the petitioner]'s claim of ineffective assistance of counsel." *Id.* at 869–70.

Clark not only received informative advice from Allen but also from his other attorney, Brown. As noted in Dr. Mayland's 2005 declaration: "Mr. Brown and I tried very hard to get [Clark] to accept the plea offer." Having been advised by both counsel, Clark ultimately "decided to go to trial." "[W]hen a defendant receives the necessary information to make a call, the fact that the ultimate decision is left to him does not render counsel absent or ineffective." *Id.* at 871. Here, as Allen declared, "[t]here was a division in the defense camp" with Allen recommending trial and "Brown [thinking] the plea was the best option." "Such conflicting advice undercuts [Clark]'s claim of ineffective assistance of counsel." *Id.* at 870.

Because Clark received adequate assistance at the plea-bargain stage, we conclude that he "received his Sixth Amendment right to effective assistance of counsel, regardless of [Allen's and Brown's] contradictory advice." *Id.* We deny relief on Issue 1.

2. **Issue 2**: In light of *Godoy v. Spearman*, we remand for further proceedings on Clark's claim that his rights to due process and an impartial jury were violated when a juror communicated with his minister.

Clark argues that his rights to due process and an impartial jury trial were violated because one of the jurors consulted with his minister about the case during trial.

The Sixth Amendment ensures a right to an impartial jury. Claims of improper juror contact with a third party are governed by the *Mattox/Remmer* framework. In *Mattox v. United States*, the Supreme Court underscored that "[i]t is vital in capital cases that the jury should pass upon the case free from external causes tending to disturb the exercise of deliberate and unbiased judgment." 146 U.S. 140, 149 (1892), *called into doubt on other grounds by Warger v. Shauers*, 135 S. Ct. 521, 526–27 (2014). The Court emphasized that: "Private communications, possibly prejudicial, between jurors and third persons, or witnesses, or the officer in charge, are absolutely forbidden, and invalidate the verdict, at least unless their harmlessness is made to appear." *Id.* at 150 (granting a new trial where a bailiff remarked to jurors that the defendant had killed two other people and where a newspaper article discussing the trial and the defendant's criminal history was brought into the jury room).

The Supreme Court in *Remmer v. United States* built upon *Mattox*, holding that "[t]he presumption is not conclusive, but the burden rests heavily upon the Government to establish, after notice to and hearing of the defendant, that such contact with the juror was harmless to the defendant." 347 U.S. 227, 229 (1954). The Court explained that "a hearing with all interested parties" should

be conducted to "determine the circumstances, the impact thereof upon the juror, and whether or not [the contact] was prejudicial." *Id.* at 230 (remanding for a hearing where FBI agents contacted a juror regarding an alleged attempt to bribe the juror and where the district court and prosecution ex parte determined that the communication was harmless without hearing from or informing the defendant).

In *Godoy*, we combined the analyses of *Mattox* and *Remmer* into a "two-step framework":

> When a defendant alleges improper contact between a juror and an outside party, the court asks at step one whether the contact was "possibly prejudicial." *Mattox*, 146 U.S. at 150. If so, the contact is "deemed presumptively prejudicial" and the court moves to step two, where the "burden rests heavily upon the [state] to establish" the contact was actually "harmless." *Remmer*, 347 U.S. at 229. If the state does not prove harmlessness, the court sets aside the verdict. When the presumption arises but the prejudicial effect of the contact is unclear, the trial court must hold a "hearing" to "determine the circumstances [of the contact], the impact thereof upon the juror, and whether or not it was prejudicial." *Id.* at 229–30.

861 F.3d at 962 (alterations in original) (parallel citations omitted) (remanding for an evidentiary hearing where a juror allegedly communicated with a "judge friend" about the case while it was ongoing).

As an initial matter, even before triggering the presumption, *Godoy* stresses that a determination must be made into the type of contact at issue. "We recognize the practical impossibility of shielding jurors from *all contact* with the outside world, and also that not all such contacts risk influencing the verdict." *Id.* at 967 (emphasis added). "[D]ue process does not require a new trial every time a juror has been placed in a potentially compromising situation." *Smith v. Phillips*, 455 U.S. 209, 217 (1982); *see also Tarango v. McDaniel*, 837 F.3d 936, 946 (9th Cir. 2016). For example, "chance contacts between witnesses and jury members—while passing in the hall or crowded together in an elevator," do not trigger the presumption because they are "[t]hreadbare or speculative allegations" of misconduct. *Godoy*, 861 F.3d at 967 (quoting *Tarango*, 837 F.3d at 947, 951); *see also United States v. Hendrix*, 549 F.2d 1225, 1229 (9th Cir. 1977) (finding that "not every incident of juror misconduct or bias requires a new trial"). Thus, folded into defendant's burden at step one, before triggering the presumption, is a showing that the juror's contact with the non-juror was "*sufficiently improper.*" *Godoy*, 861 F.3d at 967 (emphasis added).

Once the contact has been determined to be sufficiently improper, the court moves on to the second half of the first step: determining whether the sufficiently improper contact gives rise to a "*credible risk* of affecting the outcome of the case." *Id.* at 967 (emphasis added). *Godoy* instructs that "the defendant's burden at step one to show a possibility of prejudice is not onerous." *Id.* at 968. Because "highly troubling contacts do not *necessarily* raise a presumption of prejudice," courts "consider[] the full context of the contact to determine whether a credible risk of prejudice exists." *Id.* at 967. For example, was the communication significant because it was with a non-juror who was "deeply entangled

in [the] case" (such as a bailiff, law enforcement agent, victim, or witness), or was the communication "innocuous"? *Id.* at 967–68 (alteration in original) (quoting *Tarango*, 837 F.3d at 949). To determine "whether the communication raised a risk of influencing the verdict," the court may consider factors such as "the length and nature of the contact, the identity and role at trial of the parties involved, evidence of actual impact on the juror, and the possibility of eliminating prejudice through a limiting instruction." *Caliendo v. Warden of Cal. Men's Colony*, 365 F.3d 691, 697–98 (9th Cir. 2004). Taking the "surrounding circumstances" into consideration, when the juror's improper communication with a non-juror interferes with the juror's role as a juror and infects the jury as a whole, it raises a credible risk of affecting the outcome. *Godoy* establishes that when the juror's communication is sufficiently improper to raise a credible risk of affecting the outcome, then there is a presumption of prejudice. 861 F.3d at 968.

Once the presumption of prejudice is triggered, the burden shifts to the state "to *disprove* prejudice." *Id.* at 959. *Godoy* illustrates a cautionary tale in its finding that the California Court of Appeal erred by "not requir[ing] the state to make *any* showing at step two." *Id.* at 964. The state must present "contrary evidence" and "[i]t is not enough, as the state court did [in *Godoy*], to draw contrary inferences from the same statement that established the presumption in the first place." *Id.* at 959; *see also Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 254 (1981) (finding that, upon the burden shifting, when the defendant "is silent in the face of the presumption, the court must enter judgment for the plaintiff because no issue of fact remains in the case"). We provided an instructive, non-exhaustive list of examples in *Godoy*, including that the prosecution could point to

"contrary evidence elsewhere in the existing record that sheds new light on the potentially prejudicial communication." *Godoy*, 861 F.3d at 969. Or, if the prejudicial effect is "unclear from the existing record," a hearing may allow the court to "determine the circumstances [of the improper contact], the impact thereof upon the juror, and whether or not it was prejudicial." *Id.* at 959 (quoting *Remmer*, 347 U.S. at 229–30).

Almost a decade after Clark's conviction, the defense obtained a declaration from Juror Barnes. In his 1996 declaration, Barnes explained that, during the guilt phase of trial, he met with his "minister about the propriety of imposing the death penalty." After "explain[ing] to [the minister his] role in the trial and the facts of the case," the minister told him "that in these circumstances the death sentence would be appropriate because the Bible says, 'an eye for an eye.'" According to Juror Barnes' declaration, "[t]he minister's advice was useful," and Barnes affirmed that he "had long believed that anyone who is guilty of murder and convicted with a special circumstance should be given the death penalty."

Although the district court found that "the contact between Barnes and his minister was insufficient to raise a presumption of a substantial and injurious effect on the verdict," the district court did not have the benefit of our decision in *Godoy* to determine whether the contact was "sufficiently improper" and raised "a credible risk of affecting the outcome of the case." *Godoy*, 861 F.3d at 967. When faced with a determination of applying a new legal principle, "[a] standard practice, in habeas and non-habeas cases alike, is to remand to the district court for a decision in the first instance." *Detrich v. Ryan*, 740 F.3d 1237, 1248 (9th Cir. 2013) (en banc). "[W]e operate more effectively as

a reviewing court than as a court of first instance." *Id.* at 1248–49. Because "we are without the benefit of the district court's analysis" on the new standard, *Shirk v. U.S. ex rel. Dep't of Interior*, 773 F.3d 999, 1007 (9th Cir. 2014), we remand to the district court to apply in the first instance our *Godoy* framework.

By remanding, we are not opining that the district court was incorrect in its conclusion or reasoning but only directing it to apply the new standard. For guidance, we emphasize that *Godoy* does not say that all juror communications with a non-juror require that the verdict or sentence be set aside.[3] Inherent in the first step of *Godoy* is first determining whether the contact was "sufficiently improper" and then determining whether that improper contact had a "credible risk of influencing the verdict." If, and only if, the court finds that these steps are satisfied is the presumption triggered and the subsequent steps reached. We do not opine whether now, over 30 years after Clark's trial, an evidentiary hearing is required. However, if the district court finds the presumption triggered, the state must address its burden of showing that Barnes' contact with his minister was harmless—in other words, that there was "no reasonable possibility that the communication . . . influence[d] the verdict," *Godoy*, 861 F.3d at 968 (quoting *Caliendo*, 365 F.3d at 697), including the communication impacting the jury's deliberations, *id.* at 970. Investigator Wong's declaration, which was previously before the district court but which the state's counsel inexplicably failed to address on appeal, might support such a conclusion. However, because we remand for the district court to apply *Godoy*, we do not reach the evidentiary issues raised by the parties,

_____

[3] If the contact occurred after the jury found Clark guilty but before sentencing, it would have affected the sentence, not the verdict.

including the admissibility of the Wong declaration. We leave it to the district court on remand to consider this evidence and any other evidence proffered by the parties when making the determination whether or not to hold an evidentiary hearing in fulfilling its responsibility to determine whether Barnes' meeting with his minister was harmless. Again, we emphasize that the district court should read nothing more into our opinion than to apply the new standard in the first instance.

3. **Issue 3:** We deny Clark's claim that trial counsel was ineffective for calling Dr. Mayland to testify at the pre-trial suppression hearing.

Clark argues that trial counsel provided ineffective assistance of counsel by calling Dr. Peter Mayland to testify at the pre-trial suppression hearing. In particular, Clark argues that trial counsel was ineffective in three ways: (1) trial counsel called Dr. Mayland to testify without full knowledge of what Dr. Mayland would say; (2) trial counsel failed to obtain a court order assuring that Dr. Mayland's pre-trial testimony would not be used at trial; and (3) trial counsel failed to ensure that the trial experts were not exposed to inculpatory information from Dr. Mayland's pre-trial testimony. In holding that Allen did not act deficiently, the district court found that it was not unreasonable for Allen to rely on his belief that the trial court had stated that the statements from the suppression hearing would not be admissible at trial. Although we agree that Allen's reliance may not have been unreasonable, it was deficient for Allen to call Dr. Mayland to testify at the suppression hearing without Allen having fair knowledge of his testimony. Nonetheless, we conclude that Clark fails to show that he was prejudiced by Allen's performance.

### *a. Allen's performance was deficient.*

Allen's calling Dr. Mayland to testify at the pre-trial suppression hearing without having fair knowledge of his testimony constitutes representation that "fell below an objective standard of reasonableness." *Strickland*, 466 U.S. at 688; *see also supra* Part IV(B)(1).

Allen's 2005 declaration indicates that Dr. Mayland's testimony was intended to establish that "as a result of Mr. Clark's background and psychological disabilities, there was a substantial doubt as to whether Mr. Clark knowingly and intelligently waived his rights" when he confessed to the police. Dr. Mayland's 2005 declaration indicates that his role was focused on "Mr. Clark's traumatic history, deprivations, inadequate institutional responses, and substance abuse background." Clark argues, however, that Allen should have been aware that Dr. Mayland had developed a therapeutic relationship with Clark and had questioned Clark extensively about the particular facts of the crimes. In particular, at the suppression hearing, Dr. Mayland testified on cross-examination that Clark had discussed the details of the crimes with Dr. Mayland not just once in the initial interview at the Mendocino County Jail after his arrest (which Allen knew about), but also in an interview about a month after the initial interview (which Allen apparently was not informed). Dr. Mayland then testified to the detailed facts of the crimes that Clark relayed to him, including the two lewd statements made by Clark to Grover, Clark's admission of rape, and Clark's account of the crimes that appears to undercut the defense theory of a rage reaction. Allen's declaration acknowledges that he was "surprised to learn that Dr. Mayland had discussed the facts of the crime with [Clark] beyond his initial interview, and what information Dr. Mayland had obtained from [Clark]."

Allen's unawareness of the extent to which his own expert witness would testify is deficient performance under *Strickland*. Trial counsel is not required to personally interview each witness, especially "if the witness's account is fairly known to counsel." *LaGrand v. Stewart*, 133 F.3d 1253, 1274 (9th Cir. 1998) (citing *Eggleston v. United States*, 798 F.2d 374, 376 (9th Cir. 1986)). However, counsel must have a fair knowledge of the witness's account before calling the person as a witness. Here, the record indicates that Allen was unaware that Dr. Mayland had discussed the facts of the crimes with Clark beyond the initial interview. However, Allen regularly discussed the case with Dr. Mayland and had a definite defense strategy of using Dr. Mayland as an expert. This highlights the unreasonableness of Allen failing to ascertain Dr. Mayland's account before calling him as a witness. Because Allen called Dr. Mayland to testify without Dr. Mayland's account being "fairly known to counsel," *id.* at 1274, Allen's conduct was objectively unreasonable.[4]

### b. *Clark fails to establish prejudice.*

Although Allen's conduct was deficient, Clark fails to establish that Allen's performance was prejudicial. To show prejudice, Clark must establish that "counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Strickland*, 466 U.S. at 687. "An error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the judgment." *Id.*

---

[4] Clark raises several arguments for why trial counsel acted deficiently in regard to Dr. Mayland's testimony. Because we conclude Allen acted unreasonably by calling Dr. Mayland without fair knowledge of his testimony, we need not reach these additional arguments.

at 691. Accordingly, a defendant must show "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.*

When a defendant challenges a death sentence, the question is whether "there is a reasonable probability that, absent the errors, the sentencer—including an appellate court, to the extent it independently reweighs the evidence— would have concluded that the balance of aggravating and mitigating circumstances did not warrant death." *Id.* at 695. To answer that question, we must "compare the evidence that actually was presented to the jury with the evidence that might have been presented had counsel acted differently," *Bonin v. Calderon*, 59 F.3d 815, 834 (9th Cir. 1995), and "evaluate whether the difference between what was presented and what could have been presented is sufficient to 'undermine confidence in the outcome' of the proceeding," *Lambright v. Schriro*, 490 F.3d 1103, 1121 (9th Cir. 2007) (per curiam) (quoting *Strickland*, 466 U.S. at 694).

Clark fails to meet his burden. Clark focuses on the two lewd remarks that Clark told Dr. Mayland he made to Grover,[5] which, according to Clark, were the "main statements that were to infect the trial later." However, the same or similar information was admitted at trial through Clark's two confessions and defense expert testimony. Detective Kelley testified: "[Clark] said that, this is in his

---

[5] At the pre-trial suppression hearing, Dr. Mayland testified that Clark admitted to him that Clark demanded of Grover, "Why don't you show me some tit, bitch" and "suck my dick."

words, 'she flashed a titty at me.'" Clark admitted similar information in his taped confession, in which he talks about Grover exposing her breasts to him. Defense expert Dr.Raffle testified at trial, summarizing that Clark admitted to him that he told Grover "to take off her clothes, suck [his] dick." Clark fails to establish that the lewd statements he admitted to Dr. Mayland differ from any of the lewd statements he admitted during his confessions to the police and during his sessions with Dr. Raffle, which were disclosed to the jury without any objection by Clark.

Furthermore, to the extent that Clark argues prejudice from the prosecution using Dr. Mayland's statements to impeach the defense witnesses' theory of a rage reaction by showing that Clark was goal-oriented in his behavior, Clark also fails to meet his burden. Almost all of the details that were included in Dr. Mayland's testimony came in through the two police confessions. In Clark's first confession to the police, he did not discuss blacking out during the crimes. However, Clark admitted choking Grover, stabbing her, and hitting her with the concrete block. The primary detail not included in Clark's confession to the police was Clark's admission of rape. But in addition to the physical evidence presented at trial that indicated rape (e.g., vaginal lacerations and semen and pubic hair consistencies), defense experts Drs. Roberts and Raffle testified that Clark admitted to them that he raped Grover.

Given the gruesome nature of the crimes and that Clark never asserted innocence, Clark is hard-pressed to establish that Dr. Mayland's testimony prejudiced him. To demonstrate prejudice, Clark must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Franklin v. Johnson*, 290 F.3d 1223, 1233 (9th

Cir. 2002) (quoting *Babbitt v. Calderon*, 151 F.3d 1170, 1173 (9th Cir. 1998)).  Because Clark fails to demonstrate a reasonable probability that Dr. Mayland's reference to Clark's lewd statements or his statements concerning Clark being goal-oriented affected the jury's balance of aggravating circumstances and mitigating circumstances, we conclude he fails to establish prejudice necessary to show ineffective assistance of counsel on this claim.

We deny habeas relief on Issue 3.

4.  **Issue 4**: We deny Clark's claim that trial counsel was ineffective in preparing and presenting expert testimony.

Clark argues that trial counsel was ineffective in the preparation and presentation of expert testimony. Specifically, Clark argues that counsel failed to adequately prepare: (a) experts regarding Dr. Beaber's letter and Dr. Mayland's statements; (b) expert witness Dr. Roberts; and (c) expert witness Dr. Raffle.

*Strickland* governs this ineffective assistance of counsel claim: Clark must show that trial counsel's performance was both deficient and prejudicial.  *See* 466 U.S. at 687; *see also supra* Part IV(B)(1), (B)(3)(b).  "[T]he duty to investigate and prepare a defense" is flexible, but it "is not limitless: it does not necessarily require that every conceivable witness be interviewed or that counsel must pursue 'every path until it bears fruit or until all conceivable hope withers.'"  *United States v. Tucker*, 716 F.2d 576, 584 (9th Cir. 1983) (quoting *Lovett v. Florida*, 627 F.2d 706, 708 (5th Cir. 1980)).

### a. Allen's conduct regarding Dr. Beaber's letter did not prejudice Clark.

Clark first argues that Allen failed to adequately prepare the testifying experts regarding Dr. Beaber's letter. Clark does not argue that counsel was deficient for failing to seek suppression of Dr. Beaber's letter or in having Dr. Beaber's letter prepared in the first instance. Instead, Clark asserts that Allen was unaware of the existence of Dr. Beaber's letter and that he unintentionally gave Dr. Beaber's letter to Dr. Raffle. In essence, Clark argues had counsel not given the letter to the testifying experts or had Allen discussed the letter with the experts in detail, the outcome of trial would have been different. Because we conclude that Clark fails to establish prejudice, we need not address whether Allen's conduct was deficient.

Clark fails to establish prejudice because his arguments are contradicted by the record. When confronted with Dr. Beaber's letter during cross-examination, Dr. Raffle responded:

> It does not give me any of his clinical data, nor do I have available to me any of his clinical data for analysis. That is to say his testing data.
>
> It would be—it's kind of equivalent to a radiologist taking a series of X-rays and sending me a three-paragraph summary but not sending the X-rays so that I could have another radiologist look at them myself.

Dr. Raffle's testimony indicates that he found the contents of the letter unhelpful. Given that Dr. Raffle responded by noting the lack of underlying clinical data and the report's

brevity, Clark fails to demonstrate how he was prejudiced by Allen's performance.

### b. Allen's preparation of Dr. Roberts to testify did not prejudice Clark.

Second, Clark argues that the outcome of trial would have been different had Allen better prepared Dr. Roberts to testify. The defense called Dr. Roberts as an expert witness during the guilt phase to testify to Clark's impulsivity under stress and Clark's drug use. Clark asserts that trial counsel should have never called Dr. Roberts to testify because his opinion that Clark's depression was "situational" was contrary to the use of Clark's depression as mitigation. He also asserts that counsel failed to provide Dr. Roberts with an adequate clinical history in order to render a proper diagnosis.

The record, however, indicates that Dr. Roberts interviewed Clark and conducted extensive psychological testing in preparation for trial. Based on the tests Dr. Roberts conducted, Dr. Roberts reported a diagnosis of anti-social personality disorder ("ASPD"), as well as some indications of borderline personality disorder. Although Dr. Roberts requested more information regarding Clark's mental health history, trial counsel referred Dr. Roberts only to the history contained in Dr. Raffle's report. Trial counsel apparently was not aware at the time that the historical data portion of Dr. Raffle's report was incomplete. But Dr. Roberts has not indicated that his testimony regarding Clark's various test scores was incorrect or would have changed in light of any additional information that could have been provided. Clark's primary argument seems to be that, if Dr. Roberts had more complete information about Clark's history than was contained in Dr. Raffle's report, Dr. Roberts may have been able to offer reasons why a borderline personality

disorder was a better diagnosis than ASPD. But even then, trial counsel's tactical decision to put on a witness who had diagnosed Clark with ASPD, rather than stress a possible borderline personality disorder, is entitled to great deference. *Mitchell v. United States*, 790 F.3d 881, 892 (9th Cir. 2015) (rejecting Mitchell's argument that "counsel should have had Mitchell examined again by yet another doctor in search of a less damning diagnosis"). The record does not support Clark's argument that had Allen acted differently in calling and preparing Dr. Roberts to testify, the result of trial would have been different.

### c. Allen's conduct in preparing Dr. Raffle to testify was not deficient.

Third, Clark argues that trial counsel was deficient in the preparation of defense expert Dr. Raffle, who was asked to render an opinion regarding Clark's psychological state at the time of the crimes. In particular, Clark argues that Dr. Raffle did not have sufficient information regarding Clark's background and history to render an opinion.

The record, however, indicates that, while Dr. Raffle did not have all the documents related to Clark's history, counsel did provide Dr. Raffle with substantial background materials, including school psychologists' evaluations and state mental health records. Clark emphasized Dr. Raffle's lack of information about the jailhouse report that Clark had been "boastful and cocky" about the crimes and about drug levels in Clark's blood at the time of the crimes. But the record provides a reasonable explanation for Dr. Raffle's lack of awareness of these matters. The trial transcript reflects that counsel did not even know about the jailhouse report when Dr. Raffle testified. Given that counsel did not have the report at the time, he could not have given the report to Dr. Raffle. Regarding the drug levels in Clark's blood at

the time of the crimes, trial counsel's declaration indicates that witnesses Drs. Baselt and Smith were the experts charged with testifying about Clark's level of intoxication at the time of the crimes, not Dr. Raffle.  Moreover, although Dr. Raffle had some training in psychopharmacology, this was not Dr. Raffle's specialty.  Counsel's tactical decision to have different witnesses testify regarding the level of methamphetamine and other drugs in Clark's blood at the time of the crimes is entitled to deference.  *Mitchell*, 790 F.3d at 892.  We find that Clark has not shown that Allen's performance was deficient in preparing Dr. Raffle to testify.[6]

We therefore conclude that Clark has not established ineffective assistance of counsel in the preparation and presentation of expert testimony.  We deny habeas relief on Issue 4.

5.  **Issue 5**: We deny Clark's claim that trial counsel was ineffective for failing to investigate and present evidence, at the penalty phase, of Clark's fetal alcohol exposure, traumatic birth, and the effects of both.

Clark argues that trial counsel provided ineffective assistance of counsel for failing to investigate, prepare, and present evidence of Clark's alcohol exposure as a fetus, traumatic birth, and the enduring effects of both on Clark's development.  Clark asserts that four experts' post-conviction declarations show that his "medical records contained evidence that he had a difficult birth and that his mother was heavily medicated"; "that his mother was

---

[6] However, even if we determined that Clark could show deficiency, Clark has not shown prejudice.

drinking alcohol during her pregnancy and suffering beatings by Mr. Clark's father"; and "that Mr. Clark's difficulties in this area continued into childhood, with developmental delays."

Again, under *Strickland*, Clark must show that trial counsel's performance was both deficient and prejudicial. *See* 466 U.S. at 687; *see also supra* Part IV(B)(1). Counsel's duty to investigate is "not limitless." *Tucker*, 716 F.2d at 584. "[A] tactical decision may constitute constitutionally adequate representation even if, in hindsight, a different defense might have fared better." *Bemore v. Chappell*, 788 F.3d 1151, 1163 (9th Cir. 2015). We conclude that trial counsel's performance was not deficient.

To establish deficient performance, the petitioner must show that "counsel's representation fell below an objective standard of reasonableness." *Strickland*, 466 U.S. at 688; *see also supra* Part IV(B)(1).

During trial, Clark's counsel presented a defense theory that centered around disputing that he was able to form the requisite state of mind to kill based on his emotional difficulties, severe depression, and chronic drug use that culminated in a "rage reaction" on the night of the murder. The defense called several witnesses to testify that he used drugs from an early age and regularly ingested alcohol, marijuana, and methamphetamine. Witnesses also testified that Clark was severely depressed, attempted suicide in February 1985, and increased his drug usage following the suicide attempt. During the penalty phase, the defense presented testimony of 23 witnesses in mitigation—including family members, friends, scoutmasters, a teacher and a mental health counselor—who testified to the circumstances of Clark's life and character.

While Clark's counsel did not present evidence of the trauma Clark may have suffered in utero and during birth, Allen did investigate and make a substantial presentation of evidence of Clark's childhood, his abuse, and the resulting effects of both on Clark's mental and psychological development. Clark is essentially arguing on appeal that his trial counsel should have investigated further and presented a more complete picture of his life history or presented it in a different manner—beginning with his mother's pregnancy. But Allen did present extensive evidence of Clark's parents' alcohol use, his father's abuse, Clark's early use of drugs and alcohol, his difficulties in school, his severe depression, and how his family life drastically deteriorated after the deaths of his father and grandfathers—including his mother's neglect and the filthy home conditions. Allen painted a bleak picture of Clark's home life as a child and teenager and its effects on Clark's development, arguably mitigating the heinousness of the crimes. Perhaps, Allen could have done more—as indicated by Dr. Roberts's declaration that his request for additional information was denied by Allen. But a showing of deficient performance turns not on whether Allen could have done more but on whether his conduct was deficient according to professional "standards in effect at the time of [Clark's] trial." *Hamilton v. Ayers*, 583 F.3d 1100, 1129 (9th Cir. 2009).

The standards in effect at the time of Clark's trial in 1987 recognized that "[i]t is the duty of the lawyer to conduct a prompt investigation of the circumstances of the case and to explore all avenues leading to facts relevant to the merits of the case and the penalty in the event of conviction." *Id.* (quoting 1 ABA Standards for Criminal Justice 4–4.1 (2d ed. 1980)); *see also id.* ("As the Supreme Court has long recognized, the ABA Standards for Criminal Justice provide guidance as to what constitutes a 'reasonable' performance."

(quoting *Strickland*, 466 U.S. at 688–89)). Unlike cases where we have found deficient performance for failing to investigate and present mitigating evidence, here Allen presented extensive evidence of Clark's childhood abuse, early use of drugs and alcohol, difficulties in school, and severe depression. *Cf. Summerlin v. Schriro*, 427 F.3d 623, 631 (9th Cir. 2005) (en banc) (holding that counsel "utterly failed in his duty to investigate and develop potential mitigating evidence for presentation at the penalty phase" by not conducting any investigation into family or social history and "even a minimal investigation" would have uncovered a childhood with severe abuse). Much of the evidence that Clark argues, post-conviction, should have been presented goes to explain *why* Clark was the way that Allen presented him to the jury, not that Clark was presented in an *incorrect* or *incomplete* light to the jury. The evidence developed post-conviction does not suggest that Allen's presentation of Clark's troubled background was objectively unreasonable. Allen presented the jury with substantial evidence of Clark's difficult childhood, his depression, and his drug use. The later-developed evidence does not dispute this, but rather offers an additional perspective on Clark's character. But this does not establish unreasonable performance. *See Gustave v. United States*, 627 F.2d 901, 904 (9th Cir. 1980) ("Mere criticism of a tactic or strategy is not in itself sufficient to support a charge of inadequate representation.").

We conclude that Clark fails to establish that Allen's performance was deficient in not investigating, preparing, and presenting evidence of Clark's alcohol exposure as a

fetus, traumatic birth, and the enduring effects of both.**[7]**  We deny habeas relief on Issue 5.

> 6. **Issue 6**: We deny Clark's claim that trial counsel was ineffective for failing to argue that Dino Stevens was an alternative suspect and that the state committed prosecutorial misconduct for failing to disclose information about Dino.

Clark argues that: (a) his trial counsel provided ineffective assistance of counsel by failing to investigate and present evidence that Dino Stevens was an alternative suspect or co-participant in the crimes; and (b) the state committed prosecutorial misconduct by failing to disclose information about Dino to the defense.

*Strickland* governs this ineffective assistance of counsel claim: Clark must show that trial counsel's performance was both deficient and prejudicial.  *See* 466 U.S. at 687; *see also supra* Part IV(B)(1).  We conclude that Clark does not meet his burden of showing that Allen's conduct was deficient or that he was prejudiced by the prosecution's failure to disclose information about Dino.

### a.  Counsel's performance was not deficient.

Deficient performance requires showing that "counsel's representation fell below an objective standard of reasonableness." *Strickland*, 466 U.S. at 688.

Clark's arguments that trial counsel was deficient in failing to investigate and present evidence that Dino was an

---

**[7]** However, even if we determined that Clark could show deficiency, Clark has not shown prejudice.

alternative suspect or involved in Grover's murder, are unavailing. Clark argues that Dino was the last person with him before Grover was murdered, had a history of drug use and violence towards women, gave contradicting stories to the police about his whereabouts during the murder, and claimed to have known Grover. In support, Clark points to post-conviction declarations by: (a) his brother Robert Clark, who stated Dino admitted to being present during the murder; (b) his ex-girlfriend Debra Dilman, who stated Dino admitted that he and Clark met Grover at the bus station; and (c) Dino's ex-girlfriend Tami Scribner, who stated that Dino asked her to lie about him staying at her home on the night of the murder and that Dino told her that he found the screwdriver in the car. Based on this evidence, Clark argues that Allen acted unreasonably in not investigating Dino because this information would have cast doubt on Clark committing the crimes, would have undermined his confessions, and would have supported the defense theory at trial that Clark was so intoxicated that he could not accurately remember what transpired.

At best, Clark has offered a different trial strategy that, in hindsight, he claims could have been more fruitful than the strategy taken at trial. *See Gustave*, 627 F.2d at 904 ("Mere criticism of a tactic or strategy is not in itself sufficient to support a charge of inadequate representation."). According to his 2005 declaration, Allen looked into pursuing a third-party defense theory but discarded it in light of Clark's confessions. Asserting that Dino had been present would have contradicted Clark's confessions. However, the sincerity and truthfulness of Clark's confessions was an integral part of the defense's strategy to avoid the death penalty.

Furthermore, given the extent of physical evidence linking Clark to the crimes, the record shows Allen acted reasonably in not pursuing a defense based on Dino's alleged involvement.  Even taking the most egregious declaration—Robert Clark's declaration that Dino admitted being present during Grover's murder—and assuming its admissibility and credibility, the record is silent on any evidence to support this assertion.  The hair, blood, and semen linked Clark and Grover, not Dino and Grover.  The pubic hair found on Grover's body was consistent with Clark's and the analysis of semen found on Grover's body could not rule out Clark as a source.  The blood and hair found on Clark's jeans and shoes were consistent with both Clark's and Grover's.  Moreover, Clark never once mentioned Dino's involvement, including in his report to the police at the Ron-Dee-Voo restaurant, his two police confessions, or to any of the mental health experts.  Based on the overwhelming evidence, it was reasonable to view Dino's involvement as a weak theory, at best, and to decide to pursue other avenues.  Clark, thus, has not shown Allen's performance fell below an objective standard of reasonableness.[8]

### b.  Alleged Prosecutorial Misconduct

Clark also argues that the prosecution engaged in misconduct by failing to disclose that Dino: (1) had "favorable resolutions" for pending charges and offered to "make a deal"; and (2) gave statements to the prosecution during pre-trial investigations that were inconsistent with his trial testimony regarding drug use.

---

[8] However, even if we determined that Clark could show deficiency, Clark has not shown prejudice.

Under *Brady v. Maryland*, "suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." 373 U.S. 83, 87 (1963); *see also Kyles v. Whitley*, 514 U.S. 419, 433 (1995) (explaining that post-*Brady* case law has made "clear that a defendant's failure to request favorable evidence [does] not leave the Government free of all obligation"). "[T]here are three elements to a *Brady* violation: (1) 'the evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching,' (2) 'that evidence must have been suppressed by the State, either willfully or inadvertently,' and (3) 'prejudice must have ensued.'" *Reis-Campos v. Biter*, 832 F.3d 968, 975 (9th Cir. 2016) (quoting *Strickler v. Greene*, 527 U.S. 263, 281–82 (1999)). "With respect to the prejudice element, 'evidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Id.* (quoting *United States v. Bagley*, 473 U.S. 667, 682 (1985)). "A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome." *Id.* (quoting *Bagley*, 473 U.S. at 682).

First, Clark asserts that, although the prosecution provided a criminal history report with most of Dino's arrests, the prosecution failed to disclose the "favorable resolutions" of Dino's multiple pending cases, one of his arrests, and a request by Dino to "make a deal." Clark contends that this information could have been used to impeach Dino to show that he was self-interested in testifying favorably for the prosecution in order to receive more lenient treatment in his own pending criminal charges. We find this argument unpersuasive. In light of Clark's

confessions and the overwhelming physical evidence against Clark connecting him to the murder and rape, Dino's role at trial was so minimal that to impeach him would have been inconsequential to the verdict.

Second, Clark's assertion that the prosecution failed to disclose its pre-trial investigative notes that indicate Dino made a statement regarding drug use, which would have contradicted his trial testimony, is also unavailing. At trial, Dino denied his own drug use and claimed not to recall knowing of any drug use by Clark and Robyn Boyd, including on the night of the murder, other than some occasional marijuana. Clark, in contrast, argues that the prosecution failed to disclose investigation notes indicating that Dino said that Boyd did not want to admit that Dino stayed at her home on the night of the murder because of her involvement with drugs. Clark contends that this information would have impeached Dino's drug use testimony and would have raised doubts about Clark's confessions and his intent, and thus would have resulted in a different verdict and sentence.

However, the prosecutor's notes provide minimal support for Clark's intoxication defense beyond the extensive evidence already presented on Clark's drug use. During Clark's taped confession at the police station, he described his drug use. Clark's drug use on the night of the murder was the subject of testimony of several witnesses, including David Smith, who testified that he and Clark used cocaine on the night of the murder, and Matt Williams, who testified that at 10:00 p.m. on the night of murder, Clark appeared to be under the influence of something other than alcohol. In light of this evidence, Clark has not shown a reasonable probability that, had the prosecutor's notes been

disclosed to the defense, the result of the proceeding would have been different.

We deny habeas relief on Issue 6.

## C.  Uncertified Claims

In addition to the certified claims, Clark raises a number of uncertified claims.  First, we reject the state's argument that certain claims are procedurally barred from federal review.  Second, we grant a COA on seven of the ten uncertified claims, and deny a COA on the others.  Third, we deny habeas relief on all seven newly certified claims.

> 1. We reject the state's argument that Claims 14L, 18, and 20 are procedurally barred from federal review.

Based on the California Supreme Court's denial of Clark's second state habeas petition, the state argues that portions of certain claims are procedurally barred from federal court review because Clark failed to overcome the procedural default.  In particular, the state argues that the California Supreme Court denied relief as untimely because the claims could have been, but were not, raised on direct appeal and because the claims were not filed in a timely manner.  *See In re William Clark*, 855 P.2d 729 (Cal. 1993); *Ex parte Dixon*, 264 P.2d 513 (Cal. 1953).  The state argues that California's procedural bars were adequate and independent state grounds sufficient to preclude federal review.  *See Johnson v. Lee*, 136 S. Ct. 1802, 1804 (2016) (per curiam) (reversing the Ninth Circuit "[b]ecause California's procedural bar is longstanding, oft-cited, and shared by habeas courts across the Nation"); *see also Johnson v. Montgomery*, 899 F.3d 1052, 1060 (9th Cir. 2018) (recognizing that California's *Dixon* and timeliness

procedural bars are adequate and independent state law grounds to bar federal habeas review).  In response, Clark argues that these procedural defaults are not applicable because any default occurred before the California Supreme Court issued its decisions in *In re William Clark* and *In re Robbins*, 959 P.2d 311 (Cal. 1998).

The procedural bar doctrine is "a subcategory of the independent and adequate state ground doctrine" designed "to protect the state's interests by giving it the opportunity to correct its own errors." *Robinson*, 595 F.3d at 1100; *see also Coleman v. Thompson*, 501 U.S. 722, 749 (1991) ("[W]e emphasize[] the important interests served by state procedural rules at every stage of the judicial process and the harm to the States that results when federal courts ignore these rules[.]").  "Under this doctrine, a federal court ordinarily will not review a state court ruling if the state court would find that the claim was barred pursuant to an independent and adequate state procedural rule." *Robinson*, 595 F.3d at 1100.  However, we have recognized exceptions to the general rule for when "the petitioner can show either cause and prejudice, *see Coleman*, 501 U.S. at 750, or a fundamental miscarriage of justice, *see Murray v. Carrier*, 477 U.S. 478, 495 (1986), or [when] the government waive[s] the procedural default, *see Franklin v. Johnson*, 290 F.3d 1223, 1230, 1233 (9th Cir. 2002)." *Robinson*, 595 F.3d at 1100 n.10 (parallel citations omitted); *see also Fields v. Calderon*, 125 F.3d 757, 763 (9th Cir. 1997) (discussing the exceptions that have been developed by the California Supreme Court following *Dixon* and *In re Harris*, 855 P.2d 391, 398–407 (Cal. 1993)).

In California, "[t]he courts themselves have developed a number of 'procedural bars' in an attempt to put reasonable limits on collateral attacks by way of habeas corpus." *Briggs*

*v. Brown*, 400 P.3d 29, 47 (Cal. 2017) (quoting *In re William Clark*, 855 P.2d at 763–70). Two such limits include procedural bars based on direct appeal (known as the *Dixon* rule) and on timeliness (known as the *Clark* rule). The bedrock to these principles is that "habeas corpus may not be employed as a substitute for appeal." *Id.* (citing *In re Waltreus*, 397 P.2d 1001, 1005 (Cal. 1965)).

Under *Dixon*, a claim raised during habeas proceedings is barred when the petitioner could have, but failed to, raise the claim on direct appeal. *See* 264 P.2d at 513. We have emphasized that "*Dixon* stands for the proposition that an inexcusable failure to bring a trial-error claim on direct appeal normally bars consideration of that claim on habeas." *Park v. California*, 202 F.3d 1146, 1149 (9th Cir. 2000). However, if "the state court of last resort . . . exercise[d] its opportunity to act on [petitioner's] federal constitutional claims, then no procedural default occurred that would bar federal review of those claims." *Id.* at 1151.

A second procedural default rule under California law was established in *In re William Clark* related to timeliness. 855 P.2d at 751. There is "a presumption of timeliness for habeas petitions filed 'within 90 days of the final due date for the filing of an appellant's reply brief'" or "filed without substantial delay, that good cause justified a substantial delay, or that the petition fits within several enumerated exceptions." *Bradford v. Davis*, 923 F.3d 599, 610–11 (9th Cir. 2019) (quoting *In re William Clark*, 855 P.2d at 751). We have recognized that California's timeliness rule for procedural default must "be analyzed at the time the petitioner filed his [applicable] state habeas petition" and "not . . . when the California Supreme Court denied his petition" or "he filed a [subsequent] state petition." *Id.*

at 611 (citing *Calderon v. U.S. Dist. Ct.*, 103 F.3d 72, 75 (9th Cir. 1996)).

Here, the state has not met its burden of articulating the basis for us to determine that Claims 14L, 18, and 20 are procedurally barred. As Clark notes, the state's procedural bar argument on Claim 18 was not actually decided by the district court who rejected procedural default only on "Claims 14, 15, 20, 26 and 30." Furthermore, although the parties cite to the pertinent California Supreme Court decision, none of these claims (Claims 14L, 18, 20) are listed as such in that decision. If they are listed as different numbered claims, the parties have not so argued. "[J]udges are not like pigs, hunting for truffles buried in briefs." *Greenwood v. F.A.A.*, 28 F.3d 971, 977 (9th Cir. 1994) (quoting *United States v. Dunkel*, 927 F.2d 955, 956 (7th Cir. 1991) (per curiam)). The state does not provide the clarity needed to reach this argument.

Because the state has not clearly shown that these three claims are procedurally barred and because it appears that the California Supreme Court rejected the claims on their merits, we reject that Claims 14L, 18, and 20 are procedurally barred, and we elect to address the merits on these claims.[9]

### 2. We grant in part a COA.

When a habeas petitioner seeks to initiate an appeal, the petitioner must obtain a COA under 28 U.S.C. § 2253(c), regardless of whether the petition was filed pre- or post-

---

[9] We do not find that a clear showing of a procedural bar would not bar us from addressing the merits of a claim, but only no such showing was made here.

AEDPA.  *See Slack*, 529 U.S. at 478, 480–81; *see also United States v. Martin*, 226 F.3d 1042, 1045 (9th Cir. 2000). In pre-AEDPA cases, as here, we must consider whether the petitioner is entitled to a COA under AEDPA's provisions, but we apply pre-AEDPA law to the merits of the petition if a COA is granted.  *See Slack*, 529 U.S. at 482.

To obtain a COA, a petitioner must make "a substantial showing of the denial of a constitutional right."  28 U.S.C. § 2253(c)(2).  This requires that a petitioner "demonstrate that the issues are debatable among jurists of reason; that a court could resolve the issues [in a different manner]; *or* that the questions are adequate to deserve encouragement to proceed further."  *Lambright*, 220 F.3d at 1025 (alteration in original) (quoting *Barefoot v. Estelle*, 463 U.S. 880, 893 n.4 (1983)).  Whether to grant a COA is a "threshold inquiry" to entertaining an appeal, and we cannot consider the merits of a claim until a COA has been issued on that claim.  *Slack*, 529 U.S. at 482; *see also Buck v. Davis*, 137 S. Ct.  759, 773 (2017); *Miller-El v. Cockrell*, 537 U.S. 322, 336 (2003).

Clark has raised ten uncertified claims in his opening brief on appeal, as permitted under our rules.  *See* 9th Cir. R. 22-1(e).  We treat Clark's discussion of an uncertified issue as a request to expand our grant of a COA.  *United States v. Blackstone*, 903 F.3d 1020, 1028 (9th Cir. 2018).  Because Clark has not made "a substantial showing of the denial of a constitutional right," 28 U.S.C. § 2253(c)(2), for Claims 8, 14F, and 15B, we deny a COA on these claims.[10]  However,

---

[10] Clark argues that Claim 22 (the use of Dr. Mayland's testimony from the pre-trial suppression hearing violated Clark's right against self-incrimination) should be certified because it is inextricably related to certified Issue 3.  Because Clark does not make arguments regarding self-incrimination in his discussion of Issue 3 in his opening brief, this

Clark has met this threshold standard for Claims 5, 6, 11, 14L, 18, 20, and 36, and we grant a COA for these claims. For the reasons below, we deny the claims on their merits.

>    3.  **Claims 5 and 6**: We deny Clark's claims that trial counsel had conflicts of interest that adversely affected Clark's representation.

Clark argues that trial counsel had a conflict of interest based on: (1) Public Defender Susan Massini representing Clark while she was running for District Attorney; and (2) Public Defender Ronald Brown or his office previously represented a large number of prosecution and potential defense witnesses. Clark argues, in particular, that these conflicts deprived him of effective assistance of counsel because there were several plausible alternative defense strategies that were foreclosed due to the alleged conflicts of interest.

On direct appeal, the California Supreme Court rejected Clark's conflict of interest arguments in a reasoned opinion. *Clark*, 857 P.2d at 1130–31. Quoting *Cuyler v. Sullivan*, 446 U.S. 335, 348 (1980), the court determined that because Clark did not raise any objection to Massini's representation, Clark must "demonstrate that an actual conflict of interest adversely affected his lawyer's performance." *Clark*, 857 P.2d at 1126. First, the state court found no actual conflict: "we do not find that Massini's personal interest in winning the election for district attorney threatened her loyalty to defendant." *Id.* at 1127. Second, the state court found Massini's alleged conflict did not adversely affect her

argument is unavailing. Clark does not otherwise discuss or appeal Claim 22. Accordingly, we reject Clark's attempt to incorporate Claim 22 into Issue 3.

representation of Clark because Allen was co-counsel during Massini's campaign, Allen did not have a conflict, and Allen was not an employee of Massini. *Id.* at 1128. The state court also rejected Clark's argument that there was an adverse effect based on Massini's failure to adequately advocate for the suppression of evidence pre-trial. *Id.* The state court further found that the trial court did not commit error in violation of *Wood v. Georgia*, 450 U.S. 261 (1981), which requires the trial court to inquire about the alleged conflict and to obtain a knowing and intelligent waiver from the defendant. *Clark*, 857 P.2d at 1129.

Addressing Clark's allegations that Brown had a conflict of interest, the California Supreme Court concluded that there was no actual or potential conflict in the Public Defender's Office's representation of witnesses Smith, Boyd, and Dino, and no adverse effect on Clark's representation. *Id.* at 1130. Brown represented to the court that he possessed no confidential information relating to any of these three witnesses. *Id.* at 1131. Brown and Allen each attested that the cross-examination of these witnesses would not be affected by the Public Defender's Office's prior representations of these witnesses. *Id.* The court found that Brown had no interest in shielding these witnesses from impeachment. *Id.*

The California Supreme Court did, however, find Brown's representation of Williams "more troubling" because Brown personally represented Williams and possessed confidential information from their attorney-client relationship. *Id.* at 1131. Brown represented Williams on charges of receiving stolen property in February 1986—before Brown became the Public Defender and co-counsel on Clark's case. *Id.* The court found that there was an actual conflict but it did not adversely affect the representation of

Clark because (1) Brown terminated representation of Williams; (2) Brown and Allen each made sworn representations to the court that Brown did not disclose to Allen any confidential information from Brown's representation of Williams; and (3) only co-counsel Allen conducted the cross-examination of Williams. *Id.*

The district court, agreeing with the California Supreme Court, found that Clark failed to show actual conflict because he could not establish that Massini's political agenda adversely affected her performance. The district court also found that Clark waived his conflict claims against Brown, and even if the claims were valid, he failed to make a colorable claim that the alleged conflicts adversely affected counsel's performance.

Ordinarily, a petitioner claiming ineffective assistance of counsel must show under *Strickland* both deficient performance and prejudice. *See supra* Part IV(B)(1) and (B)(3)(b). But the Supreme Court in *Mickens* prescribes "an exception to this general rule" where prejudice is presumed, when there is an "actual conflict of interest." *Mickens*, 535 U.S. at 166, 171. The Court defined "an actual conflict of interest" to mean "precisely a conflict *that affected counsel's performance*—as opposed to a mere theoretical division of loyalties[,]" which is a two-step inquiry that a defendant must show a conflict of interest *and* that the conflict *actually affected* counsel's performance. *Id.* at 171.

### a. Massini: No Actual Conflict

Clark argues that Massini's election to District Attorney created a conflict of interest that deprived him of effective assistance of counsel. Future employment plans do not alone

create an "actual conflict."[11]  *Garcia*, 33 F.3d at 1198–99 (future job with the prosecutor's office); *see also Maiden v. Bunnell*, 35 F.3d 477, 480–81 (9th Cir. 1994) (finding that crossing the line from prosecution to defense does not necessarily create a conflict of interest); *United States v. Unruh*, 855 F.2d 1363, 1379 (9th Cir. 1987) (holding that defense counsel's application for employment as an Assistant United States Attorney did not constitute an actual conflict).

Thus, Massini's future employment as the District Attorney did not by itself create an actual conflict.  Clark has not specified how Massini's political agenda adversely affected her representation of Clark.  Rather, he offers only general criticisms: Massini did "not interview a single witness"; she "hid her conflict from Mr. Clark;" and "closely controlled the case to protect her electoral position."  The record, however, does not support Clark's assertions. Massini, recognizing her own inexperience on capital defense, requested that Allen, an experienced capital defense attorney, join the case.  Allen, who was not associated with the Public Defender's Office, joined as co-counsel, almost five months before voir dire began.  Allen attested to the state court that he did not have any conflicts with witnesses. *See Burger v. Kemp*, 483 U.S. 776, 784 (1987) ("[W]e generally presume that the lawyer is fully conscious of the overarching duty of complete loyalty to his or her client."). Allen zealously advocated for Clark with an extensive defense throughout trial and a substantial presentation of mitigating evidence at the penalty phase.  Nothing in the record suggests that Massini allowed her possible election to

---

[11] Once Massini became the District Attorney, her office was recused in this case and replaced by the Attorney General, so Clark's claim is necessarily premised on Massini's *future* employment.

affect her representation of Clark. We therefore find that Clark fails to establish that Massini running for District Attorney was more than "a mere theoretical division of loyalties." *Mickens*, 535 U.S. at 171.

### b.   *Brown: No Adverse Effect*

Clark argues that Brown's representation of witnesses created a conflict of interest that foreclosed Brown's ability to present sufficient evidence to support plausible, alternative defense theories. In particular, Clark contends that Brown could not (a) rebut the jailhouse report; (b) establish that heavy drug use caused Clark to suffer a rage reaction and/or to blackout; and (c) assert a "third party defense" that Dino was also involved in the murder.

Conflicts of interest can arise from concurrent representation of clients in separate matters. *See Mickens*, 535 U.S. at 175. But Clark must show that Brown "*actively represented* conflicting interests," *Earp*, 431 F.3d at 1182–83 (emphasis added) (quoting *Mickens*, 535 U.S. at 166), and that Brown "was influenced in his basic strategic decisions by the [conflicted] interests." *Mickens*, 535 U.S. at 170 (quoting *Wood*, 450 U.S. at 272).

First, Clark's argument concerning the jailhouse report is not persuasive.[12]  The evidence that Clark relies on— declarations by two inmates and a corrections officer opining favorably on Clark's character—fails to establish an actual conflict that affected counsel's performance. Although Inmate Brackett's 1998 declaration states that Brown

---

[12] *See also infra* Part IV(C)(7) addressing Clark's argument that his trial counsel provided ineffective assistance of counsel for failing to rebut the jailhouse report (Claim 14L).

represented him in 1985, the record is silent on any further supporting evidence and Clark does not demonstrate an actual conflict. Furthermore, although Investigator McPherson's 2005 declaration states that he "could not interview the inmates who reported this because they were Public Defender clients," he does not specify that Brown directly represented the inmates during Clark's trial. The record does not support an actual conflict of Brown with the inmates named in the report—Barella, Hull, Brackett, and Strobridge. Clark fails to establish an actual conflict, let alone that Brown's role as the public defender affected his representation of Clark.

Second, we also reject Clark's argument that Brown's and the Public Defender's Office's prior representation of the prosecution witnesses prevented the defense from impeaching the prosecution witnesses or calling potential defense witnesses. The defense's case revolved around the theory that Clark's heavy drug use caused him to suffer a "rage reaction," thus negating the requisite mens rea. Clark claims that the testimony of certain prosecution witnesses— Williams, Smith, Dino, and Boyd—minimized the defense's theory of heavy drug use, thus adversely affected Clark's representation.

Although Brown's personal representation of Williams created a conflict, as Brown concurrently represented Williams and Clark, nothing in the record indicates that the conflict adversely affected Clark's representation. Rather, Brown took steps to eliminate any adverse effect: Brown terminated representation of Williams; Brown and Allen each attested that Brown did not disclose to Allen any confidential information from Brown's representation of Williams; and only co-counsel Allen conducted the cross-examination of Williams. The record does not indicate that

Brown was influenced in his basic strategic decisions by his representation of Williams.

The Public Defender's Office represented witnesses Smith, Dino, and Boyd, but Brown did not personally represent them. Clark argues that these witnesses' extensive involvement with the criminal justice system with their own convictions and charges prevented the defense team from impeaching them and that these witnesses minimized or denied Clark's drug use and its effects. These arguments are meritless in the context of the entire defense case that extensively stressed Clark's heavy drug use. Furthermore, Brown represented to the court that he possessed no confidential information relating to any of these three witnesses, and both Brown and Allen each represented to the court that the cross-examination of these witnesses would not be affected by the Public Defender's Office's prior representations of these witnesses. *See Holloway v. Arkansas*, 435 U.S. 475, 485 (1978) ("An 'attorney representing two defendants in a criminal matter is in the best position professionally and ethically to determine when a conflict of interest exists or will probably develop in the course of a trial.'" (quoting *State v. Davis*, 514 P.2d 1025, 1027 (Ariz. 1973)); *see also Alberni v. McDaniel*, 458 F.3d 860, 870 (9th Cir. 2006). Clark has failed to establish that any alleged conflict with witnesses adversely affected Clark's representation.

Third, Clark's assertion that Dino Stevens's pending charges created "multiple, interlocking conflicts" is not persuasive. Brown did not personally represent Dino; Brown represented to the court that he possessed no confidential information relating to Dino; and both Brown and Allen each represented to the court that the cross-examination of Dino would not be affected by the Public

Defender's Office's prior representations of Dino. Clark fails to articulate more than "a mere theoretical division of loyalties." *Mickens*, 535 U.S. at 171.

We conclude that Clark has not established any actual conflict of interest that adversely affected trial counsel's representation of Clark, and thus we deny habeas relief on Claims 5 and 6.

    4. **Claim 8**: We deny a COA on Clark's claim that trial counsel was ineffective for failing to challenge the methamphetamine drug level testimony.

Clark argues that trial counsel rendered ineffective assistance of counsel by failing to challenge the methamphetamine drug level testimony offered at trial. In particular, Clark asserts that trial counsel did not consult with an independent forensic toxicologist about the effect of the drug levels on Clark nor investigate the collection, storage, transportation, and analysis of the blood sample.

However, the jointly-hired forensic toxicologist testified to the low level of drugs in Clark's blood and another defense expert testified that any debilitating effect could not be determined due to the low levels. We conclude that Clark has not demonstrated that this claim raises "questions [that] are adequate to deserve encouragement to proceed further." *Lambright*, 220 F.3d at 1025 (quoting *Barefoot*, 463 U.S. at 893 n.4). Because Clark cannot make "a substantial showing of the denial of a constitutional right," 28 U.S.C. § 2253(c)(2), we therefore deny Clark's request for a COA on Claim 8 and do not address the merits of this claim.

5. **Claim 11**: We deny Clark's claim that trial counsel was ineffective for failing to present life history evidence at the penalty phase.

Clark argues that his trial counsel provided ineffective assistance at the penalty phase by failing to investigate, prepare, and present more evidence about Clark's life history.[13] Specifically, Clark contends that his trial counsel failed to present additional mitigating evidence regarding: (1) Clark's genetic predisposition for depression and substance abuse; (2) Clark's father's violence toward Clark's mother, Clark, and his siblings; (3) Clark's mother's drinking problem, abandonment, and physical abuse of her children; (4) Clark's longstanding learning disability; (5) Clark's longstanding mental health issues; and (6) the nature and extent of Clark's drug use. In support of these arguments, Clark relies on post-conviction declarations of psychologist Dr. Sanislow, defense mental health experts Drs. Roberts and Raffle, and other experts, to give a more detailed account of Clark's life history than provided during trial. Clark argues that this additional information would have "paint[ed] a much more sympathetic picture."

To assess Clark's claim, we must take into account the substantial life history evidence Clark's counsel did present at the penalty phase. Clark's trial counsel presented to the jury extensive testimony that Clark's mother developed a drinking problem and abandoned her children, leaving the home in extreme disrepair and Clark to care for his younger siblings until Clark was ultimately placed in foster care. *See Clark*, 857 P.2d at 1145–46. Counsel presented evidence

---

[13] *See supra* Part IV(B)(5) for the portion of Claim 11 (Issue 5) that addresses Clark's argument that trial counsel was ineffective for failing to investigate Clark's traumatic birth and its effects.

that Clark's mother beat her children with Hot Wheels tracks and other items. Also, counsel proffered evidence about Clark's longstanding learning disability with reading, including testimony from one of his special education teachers. *See id.*

In addition, counsel investigated and presented evidence during both the guilt and penalty phases about Clark's longstanding mental health issues. *See id.* at 1145. Clark's family members and a county counselor who had treated Clark's family testified that Clark was severely and chronically depressed and withdrawn following the death of his father when Clark was twelve years old.

Counsel also presented testimony about Clark's drug use at both the guilt and penalty phases. Clark began experimenting with drugs and alcohol around the age of twelve following the death of his father and started regularly using harder drugs like methamphetamine within the year before the murder. Counsel showed the jury that blood tests supported that Clark had a "high therapeutic" or "low abuse" amount of methamphetamine at the time of the murder. *Id.* at 1114.

Clark's counsel, though, did not present *all* of Clark's life history evidence. As the state acknowledges, the defense did not present evidence that Clark was genetically predisposed to mental illness and substance abuse based on his family background. Additionally, it appears that the defense did not present to the jury that as part of his depression, Clark was self-destructive (e.g., electrocuting himself by putting his hand in the toaster). Clark concedes on appeal, though, that counsel proffered evidence to the jury that Clark attempted suicide a few months before Grover's murder. Clark contends that the evidence presented at trial relating to his drug use failed to capture the

"degree" of his escalating methamphetamine addiction and "its effect on his functioning" leading up to and at the time of Grover's murder.

Also, Clark's father's violence towards his children was not presented at trial. The jury heard that Clark's father was an alcoholic, that he beat Clark's mother, and that she got a restraining order against him. Clark's mother testified at the penalty phase that Clark's father was "[v]erbally" abusive with his children "when he was drinking." But the jury did not hear that Clark's father also *physically* abused his children. For example, the jury was not informed that Clark's drunken father first struck Clark at eight months old, or that he frequently beat Clark and his brother. Further, although counsel generally proffered evidence that Clark's father "physically abused" or "beat" Clark's mother, counsel did not present the details, including that he raped her, which prompted her to finally leave him when Clark was about ten years old.

However, most of the additional mitigating evidence that Clark argues should have been presented is cumulative of the evidence presented during the guilt and penalty phases. Although additional evidence of Clark's early childhood and Clark's father's violence could have been presented, Allen proffered extensive evidence to illustrate that Clark suffered a traumatic, abusive childhood and experienced its effects on his development, mental health, and substance use. *See also supra* Part IV(B)(5). The record supports our finding that Allen's presentation of Clark's life history evidence during the guilty and penalty phases was adequate under 1987 standards and not objectively unreasonable. *See Hamilton*, 583 F.3d at 1129 ("As the Supreme Court has long recognized, the ABA Standards for Criminal Justice provide guidance as to what constitutes a 'reasonable' performance."

(quoting *Strickland*, 466 U.S. at 688–89)).   Clark's objections that Allen should have presented more life history evidence are more akin to "[m]ere criticism of a tactic or strategy." *Gustave*, 627 F.2d at 904.

We, therefore, conclude that Clark has not shown that trial counsel's presentation of life history evidence was deficient.[14]   We deny habeas relief on Claim 11.

> 6. **Claim 14F**: We deny a COA on Clark's claim that trial counsel was ineffective for failing to challenge pathologist and criminalist testimony.

Clark argues that trial counsel provided ineffective assistance of counsel by failing to challenge the state's pathologist and criminalist testimony.   The state's pathologist testified that, after Clark choked Grover, she was alive and breathing at the time of the stabbing and of the blunt force blows to her head and neck.   Clark argues that this conclusion was incorrect because there was no evidence of aspirated blood.   Clark also argues that the pathologist's testimony and the prosecution's closing argument incorrectly implied sodomy of the victim.   In essence, Clark argues that the sequence of events leading to Grover's death was misrepresented at trial and that she was unconscious or already dead prior to the administration of blunt force.

Clark, however, does not dispute that he choked Grover, stabbed her with a screwdriver, and threw concrete blocks on her head.   Because Clark fails to show that the relevance of when Grover died is "debatable among jurists of reason," *Lambright*, 220 F.3d at 1025 (quoting *Barefoot*, 463 U.S.

---

[14] However, even if we determined that Clark could show deficiency, Clark has not shown prejudice.

at 893 n.4), he cannot make "a substantial showing of the denial of a constitutional right," 28 U.S.C. § 2253(c)(2). We deny Clark's request for a COA on Claim 14F, and do not address the merits of this claim.

> 7. **Claim 14L**: We deny Clark's claim that trial counsel was ineffective for failing to rebut the jailhouse report.

Clark argues that trial counsel provided ineffective assistance for failing to rebut the jailhouse report that indicated that Clark had a "cocky attitude" by presenting evidence during the penalty phase of Clark's remorse and positive adjustment to prison.

Clark's argument that any reasonable counsel, given the powerful mitigation of remorse and positive adjustment to prison, would have rebutted the jailhouse report is unconvincing. In support of his arguments, Clark relies on post-conviction declarations from two of the inmates named in the jailhouse report that indicated statements in the report were false, and from a corrections officer who "spoke with other officers who knew [Clark] and his reputation in the jail [as] one of being peaceful, obedient, and non-violent."

Counsel, however, presented extensive mitigating evidence at the penalty phase, including 23 witnesses who testified to Clark's character. *See supra* Parts IV(B)(5) and IV(C)(5). To insist that counsel should have presented additional evidence that Clark was "remorseful," amounts to "[m]ere criticism of a tactic or strategy [that] is not in itself sufficient to support a charge of inadequate representation." *Gustave*, 627 F.2d at 904. Allen proffered extensive mitigating evidence on Clark's behavior as a protective older brother to his younger sister, a caregiver to his paraplegic friend, a considerate person who would break up fights as a

teenager, a reliable worker with a good attitude in his jobs, and a non-rowdy, good person as a tenant. The post-conviction evidence that Clark argues should have been presented did not exist at the time of the trial. At most, the evidence developed post-conviction suggests that Allen could have taken a different tactic during the penalty phase but does not suggest that Allen's presentation of mitigating evidence on Clark's behavior was objectively unreasonable. We conclude that Allen's performance was not deficient,[15] and we therefore deny habeas relief on Claim 14L.

> 8. **Claim 15B**: We deny a COA on Clark's claim that habeas relief is warranted under *Batson v. Kentucky* because the prosecutor discriminatorily used its peremptory challenges.

Clark argues that he was denied his rights to equal protection and due process by the prosecution's discriminatory use of peremptory challenges to exclude prospective jurors based on their race. *See Batson v. Kentucky*, 476 U.S. 79 (1986). Specifically, Clark argues that the prosecutor exercised five preemptory challenges to remove all but one of the Latino prospective jurors.

However, defense counsel conceded during trial that the prosecutor offered race-neutral reasons that met the prosecution's *Batson* burden. Clark therefore fails to establish that this claim is "debatable among jurists of reason," *Lambright*, 220 F.3d at 1025 (quoting *Barefoot*, 463 U.S. at 893 n.4), and thus does not make "a substantial showing of the denial of a constitutional right," 28 U.S.C.

---

[15] However, even if we determined that Clark could show deficiency, Clark has not shown prejudice.

§ 2253(c)(2).	We deny Clark's request for a COA on Claim 15B and do not address the merits of this claim.

> 9. **Claim 18**: We deny Clark's claim that he was denied his constitutional right to be present for critical stages of the proceedings.

Clark argues that he was denied his Sixth Amendment right to be present at two meetings regarding possible conflicts of interest with counsel: (a) an "off-the-record" meeting on February 7, 1986, between the state court and counsel to discuss Massini's candidacy for District Attorney; and (b) an "in-chambers conversation" regarding the admissibility at trial of Dr. Mayland's testimony from the pre-trial suppression hearing.

The right to a public trial under the Sixth Amendment, "taken together with the right to due process, includes a right of . . . defendant[] and [his] counsel to be present at all stages of the trial from arraignment to verdict and discharge of the jury." *Polizzi v. United States*, 550 F.2d 1133, 1137 (9th Cir. 1976) (concluding that a defendant's presence was not required during the judge's questioning of the jurors after the verdict). This right, however, "is not absolute." *Id.* The defendant "has a due process right 'to be present in his own person whenever his presence has a relation, reasonably substantial, to the fulness of his opportunity to defend against the charge.'" *Kentucky v. Stincer*, 482 U.S. 730, 745 (1987) (quoting *Snyder v. Massachusetts*, 291 U.S. 97, 105–06 (1934), *overruled in part by Malloy v. Hogan*, 378 U.S. 1 (1964)). However, it is not a guaranteed right "when presence would be useless, or the benefit but a shadow," *id.* at 745 (quoting *Snyder*, 291 U.S. at 106–07), or when the defendant "could have done nothing had [he] been at the conference, nor would [he] have gained anything by attending," *United States v. Gagnon*, 470 U.S. 522, 527

(1985) (per curiam) (concluding that a defendant's presence was not required at an *in camera* discussion between the judge and a juror). "Thus, a defendant is guaranteed the right to be present at any stage of the criminal proceeding that is critical to its outcome if his presence would contribute to the fairness of the procedure." *Stincer*, 482 U.S. at 745. The "exclusion of a defendant from a trial proceeding should be considered in light of the whole record." *Gagnon*, 470 U.S. at 526–27.

We reject Clark's argument that, if he were present at the meeting about Massini's conflict, he would have insisted on a full hearing and removal of counsel. The discussions at this meeting were later described by defense counsel in open court for the trial judge in Clark's presence, and Clark made no objections or requests for a further hearing. Moreover, when the conflicts were explained to Clark, he stated on the record that he wanted Brown and Allen to continue to represent him. Clark therefore has not shown that he would "have gained anything by attending." *Gagnon*, 470 U.S. at 527.

We also are unpersuaded by Clark's argument that his constitutional right was infringed by being excluded from the in-chambers conference regarding the admissibility of Dr. Mayland's pre-trial testimony. Clark asserts that this meeting constituted a critical stage because "it was there that counsel believed he had extracted a promise the statements could not be used," and Clark had expressly stated that he did not wish for these statements to come before the jury. But defense counsel believed that the judge ruled favorably for the defense at the in-chambers conference by excluding Dr. Mayland's testimony at trial. *See supra* Part IV(B)(3). Moreover, on direct appeal, the California Supreme Court found that the in-chambers conference concerned "the length

of time for a hearing and the possible defense witnesses to be called," which did "not implicate defendant's opportunity to defend himself." *Clark*, 857 P.2d at 1138. Clark has not explained how he could have done anything differently or what he would have gained had he been at the in-chambers conference. *Cf. Gagnon*, 470 U.S. at 526–27. We thus find that Clark has not demonstrated that his constitutional right to be present was infringed.

We conclude that Clark has not explained how his presence at these two meetings had a reasonably "substantial relationship" to his ability to defend himself, *Stincer*, 482 U.S. at 746, and we deny habeas relief on Claim 18.

> 10. **Claim 20**: We deny Clark's claim that habeas relief is warranted under *Brady v. Maryland* because the state failed to disclose the Manda Report and the prosecutor's interview notes.

Clark argues that the prosecution failed to disclose two pieces of exculpatory evidence: (a) the Manda Report and (b) the prosecutor's interview notes from a conversation with the officers regarding Clark's confession in the patrol car.

### a. The Manda Report

Under *Brady*, "suppression by the prosecution of evidence favorable to an accused . . . violates due process where the evidence is material either to guilt or to punishment." 373 U.S. at 87; *see supra* Part IV(B)(6)(b). The petitioner must show that "there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Reis-Campos*, 832 F.3d at 975 (quoting *Bagley*, 473 U.S. at 682).

Clark argues that he was prejudiced by the prosecution's failure to disclose the coroner's report prepared by Deputy Manda (Manda Report) because it would have contradicted the officers' testimony. At the preliminary hearing, suppression hearing, and trial, Detectives Kelley and Gall testified that they learned of Grover's several stab wounds to her back *after* Clark's patrol car confession. Clark argues that Detective Gall's testimony that he went to the mortuary and learned of the stab wounds at approximately 2:00 p.m. would have been contradicted by the Manda Report, which indicates that Detective Gall viewed the stab wounds at the mortuary prior to 11:00 a.m., which occurred before Clark's patrol car confession. Clark argues that he knew of the stab wounds only because the officers had told him, which would have supported his drug-induced blackout and rage reaction theories and would have refuted the prosecution's characterization during the penalty phase that Clark was a sociopathic liar.

Even if the Manda Report supported the possibility that the officers could have told Clark that Grover had been stabbed in the back, there is nothing in the Manda Report suggesting that the officers knew that the weapon was a screwdriver. The screwdriver, which bore traces of human blood, was not found in David Smith's car until approximately a week after the murder. Therefore, Clark's statement in the patrol car that he had stabbed Grover several times with "what appeared to be *a screwdriver*, just the metal shaft part" had to be based on his personal knowledge, and could not have come from the officers.

In addition, testimony by Michelle Stevens undermines Clark's claim.[16] Michelle testified that when Clark returned to the house early in the morning after the murder, Clark told her that he had found the body of a teenage girl. Michelle testified that Clark told her the girl's head was swollen and it looked like she had been raped and "stabbed by something like a screwdriver." Clark's conversation with Michelle occurred before Clark's meeting with Detectives Kelley and Gall. Clark argues that Michelle's testimony is unreliable and that she did not mention the screwdriver when interviewed by officers that morning. But Michelle's testimony nonetheless suggests that Clark had personal knowledge that Grover was stabbed with a screwdriver. Thus, the Manda Report would not have undermined the prosecution's argument that Clark had personal knowledge that Grover had been stabbed and that Clark did not learn this information from the officers.

We therefore conclude that there is not a "reasonable probability that . . . the result of the proceeding would have been different" if the Manda Report had been disclosed to the defense. *Reis-Campos*, 832 F.3d at 975 (quoting *Bagley*, 473 U.S. at 682).

### b. Prosecutor's Interview Notes

Clark also argues that the prosecution withheld interview notes by Deputy District Attorney Robert Hickok that contradicted the testimony of Detectives Kelley and Gall that Clark was calm during his patrol car confession. The notes indicate that the officers told Hickok that the reason for Detective Gall's response to Clark's 30-years question was

---

[16] Michelle was unavailable to testify at trial, so the parties agreed that her preliminary hearing testimony would be read to the jury.

"we were attempting to consol [sic] [Clark] at that time, cooling out the situation so that he wouldn't 'freak out' at the hospital."  Clark argues that the notes support that Clark was in distress at the time of his patrol car confession and that Detective Gall's 30-years statement was a promise to Clark of leniency.  Clark asserts that the disclosure of the notes would have led to the suppression of his patrol car confession, and without the patrol car confession, the prosecution would not have been able to use it to undermine his taped statement that he had blacked out during the murder.  We disagree.

Clark fails to show a reasonable probability that the result of trial would have been different.  His taped confession would still be admissible, in which he admitted to choking Grover, "bashing one rock into her," and "throwing a piece of metal" that "looked like an old broken screwdriver" after she "said she was going to cry rape."  He also admitted that after the murder he changed his clothes and pretended to find the body as a cover up.  Given the overwhelming evidence against Clark, the prosecutor's notes would not have changed the jury's rejection of Clark's claim that he had blacked out during the murder.  We therefore conclude that Clark has not shown, even if the prosecutor's notes were disclosed to the defense, that there is "a probability sufficient to undermine confidence in the outcome."  *Reis-Campos*, 832 F.3d at 975 (quoting *Bagley*, 473 U.S. at 682).

We thus deny habeas relief on Claim 20.

11. **Claim 36**: We deny Clark's claim that habeas relief is warranted because cumulative errors denied Clark's right to a fair trial.

Finally, Clark argues that his habeas claims must be analyzed for cumulative error. "Although individual errors looked at separately may not rise to the level of reversible error, their cumulative effect may nevertheless be so prejudicial as to require reversal." *United States v. Necoechea*, 986 F.2d 1273, 1282 (9th Cir. 1993). "In reviewing for cumulative error, the court must review all errors preserved for appeal and all plain errors." *Id.* "[T]he combined effect of multiple trial court errors violates due process where it renders the resulting criminal trial fundamentally unfair." *Parle v. Runnels*, 505 F.3d 922, 927 (9th Cir. 2007); *see also Chambers v. Mississippi*, 410 U.S. 284, 302 (1973). Cumulative error warrants habeas relief where the errors "so infected the trial with unfairness," *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974), as to have a "substantial and injurious effect or influence in determining the jury's verdict," *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993) (citation omitted).

In analyzing all of Clark's claims on appeal, we conclude that cumulative error does not warrant reversal. Given the overwhelming evidence against Clark at trial, any error that may have occurred did not infect the trial with unfairness.

We deny habeas relief on Claim 36.

## V.  CONCLUSION

We **AFFIRM** the district court's denial of habeas corpus relief on Issues 1, 3, 4, 5, and 6. We **VACATE** the district court's denial of habeas corpus relief on Issue 2, and we **REMAND** to the district court for the limited purpose to

reconsider Issue 2 in light of our decision in *Godoy v. Spearman*, 861 F.3d 956 (9th Cir. 2017) (en banc).

We extend a COA to Claims 5, 6, 11, 14L, 18, 20 and 36, and we **DENY** habeas corpus relief on these claims. We **DENY** a COA on Claims 8, 14F, and 15B.